## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEURIG INCORPORATED,               )
                                   )
     Plaintiff,              )
                                   )   C.A. No. 10-841-SLR
     v.                     )
                                   )   **JURY TRIAL DEMANDED**
STURM FOODS, INC.,                 )
                                   )
     Defendant.              )

## DEFENDANT STURM FOODS, INC.'S ANSWERING BRIEF IN OPPOSITION
## TO KEURIG'S MOTION FOR PRELIMINARY INJUNCTION

OF COUNSEL:

Craig S. Fochler
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Tel: (312) 832-4500

Allen A. Arntsen
FOLEY & LARDNER LLP
Verex Plaza
150 East Gilman Street
Madison, WI 53703
Tel: (608) 257-5035

Dated: November 9, 2010
989060 / 35644

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Sturm Foods, Inc.*

# TABLE OF CONTENTS

**Page(s)**

I.   NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

II.  SUMMARY OF THE ARGUMENT ............................................................................... 1

III. COUNTER STATEMENT OF FACTS ............................................................................ 1

    A.   Keurig's Single-Serve Brewers and Beverage Cartridges ...................................... 1

    B.   Sturm's Coffee Cartridge ...................................................................................... 2

IV.  ARGUMENT ................................................................................................................. 4

    A.   Keurig Is Not Likely To Succeed On The Merits Of Its Claims. ............................ 5

        1.   Keurig's Trademark Infringement and Unfair Competition Claims
            Fail. ............................................................................................................. 5

            a.   Keurig Has Failed To Show A Likelihood Of Consumer
                 Confusion. ...................................................................................... 5

                 (i)   Goods Are Not Impulse Purchases ..................................... 6

                 (ii)  Actual Confusion Evidence and the Period of
                      Sturm's Use ........................................................................ 7

                 (iii) Sturm Has No Wrongful Intent ........................................... 7

                 (iv)  Balance Of *Lapp* Factors ................................................... 9

            b.   The Affirmative Defense of Fair Use Bars Keurig's Claim .......... 10

        2.   Keurig Is Unlikely To Succeed On Its False Advertising Claim ............. 13

            a.   Keurig's Allegations of An Implied Claim Lack Support ............ 13

            b.   Keurig's Test Evidence Should Be Given No Weight. ................. 15

            c.   There Is No Likelihood Of Injury To Keurig. .............................. 16

    B.   Keurig Will Not Be Irreparably Harmed Absent An Injunction. .......................... 17

    C.   The Balance Of Harms And Public Interest Favors Sturm, Not Keurig .............. 17

    D.   Keurig's Claims Are Barred By The Doctrine of Unclean Hands ........................ 19

V.   CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

Page(s)

*Abbott Labs. v. Andrx Pharms.*,
452 F.3d 1331 (Fed. Cir. 2006) ........................................................................17-18

*Al-Site Corp. v. VSI Int'l, Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) ..............................................................................9

*Anheuser-Busch, Inc. v. Balducci Pubs.*,
28 F.3d 769 (8th Cir. 1994) ....................................................................................8

*Blair v. Scott Specialty Gases*,
283 F.3d 595 (3d Cir. 2002) .................................................................................15

*Cartier, Inc. v. Deziner Wholesale, LLC*,
55 U.S.P.Q.2d 1131 (S.D.N.Y. 2000) ....................................................................8

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993) .................................................................................13

*Century 21 Real Estate Corp. v. LendingTree, Inc.*,
425 F.3d. 211 (3d Cir. 2005) .........................................................................*passim*

*Chanel, Inc. v. Gordashevsky*,
558 F. Supp. 2d 532 (D.N.J. 2008).........................................................................8

*Charles of the Ritz Group Ltd. v. Quality King Distribs.*,
636 F. Supp. 433 (S.D.N.Y. 1986) .........................................................................8

*Ciba-Geigy Corp. v. Bolar Pharm. Co.*,
747 F.2d 844 (3d Cir. 1984) .................................................................................19

*Clinton E. Worden & Co. v. Cal. Fig Syrup Co.*,
187 U.S. 516 (1903) .............................................................................................19

*eBay, Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ...............................................................................................4

*Electronics Corp. of Am. v. Honeywell, Inc.*,
428 F.2d 191 (1st Cir. 1970)................................................................................17

*Fed. Express Corp. v. Fed. Espresso, Inc.*,
201 F.3d 168 (2d Cir. 2000). ...............................................................................17

*Int'l Data Group, Inc. v. Ziff Davis Media, Inc.*,
145 F. Supp. 2d 422 (D. Del. 2001) ..................................................................9, 19

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Rohne-Poulenc Rorer Pharms, Inc.*,
  19 F.3d 125 (3d Cir. 1994) ...................................................................................13, 14

*J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.*,
  No. 96-cv-5819, 1997 WL 83766 (E.D. Pa. Feb. 19, 1997)...............................14, 16

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
  562 F.3d 553 (3d Cir. 2009). ......................................................................................17

*Lorillard Tobacco Co. v. S&M Brands, Inc.*,
  616 F. Supp. 2d 581 (E.D. Va. 2009) ...........................................................................8

*McNulty v. Citadel Broadcasting Co.*,
  58 Fed. Appx. 556 (3d Cir. 2003)...............................................................................16

*New Kids on the Block v. News Am. Pub., Inc.*,
  971 F.2d 302 (9th Cir. 1992) ......................................................................................11

*Noasha LLC v. Nordic Group of Companies, Ltd.*,
  630 F. Supp. 2d 544 (E.D. Pa. 2009)..........................................................................17

*Pharmacia Corp. v. GlaxoSmithKline Consumer Heathcare, L.P.*,
  292 F. Supp. 2d 594 (D.N.J. 2003)..............................................................................18

*Pilot Corp. of Am. v. Fisher-Price, Inc.*,
  344 F. Supp. 2d 349 (D. Conn. 2004)............................................................................9

*Porter v. Farmers Supply Serv., Inc.*,
  617 F. Supp. 1175 (D. Del. 1985) ...............................................................................11

*QVC, Inc. v. Your Vitamins, Inc.*,
  C.A. No. 10-094-SLR, 2010 WL 2985801 (D. Del. July 27, 2010) ...................4, 13

*Sanofi-Aventis v. Advancis Pharm. Corp.*,
  453 F. Supp. 2d 834 (D. Del. 2006) ..............................................................................7

*SI Handling Sys. Inc. v. Heisley*,
  753 F.2d 1244 (3d Cir. 1985) ......................................................................................18

*Strike Holding LLC v. UC Strikes LLC*,
  No. 05-CV-1023, 2005 WL 1799412 (E.D. Pa. July 28, 2005) ....................................7

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992) ......................................................................................................8

*Volkswagenwerk AG v. Church*,
  411 F.2d 350 (9th Cir. 1969) ......................................................................................11

*W.L. Gore & Assocs., Inc. v. Johnson & Johnson,*
    882 F. Supp. 1454 (D. Del. 1995) ........................................................................... 18


**<u>Regulations</u>**

21 C.F.R. § 101.2 ........................................................................................................ 20

21 C.F.R. § 101.4 ........................................................................................................ 20

Defendant Sturm Foods, Inc. ("Sturm") respectfully submits this opposition to Keurig Incorporated's ("Keurig") Motion for Preliminary Injunction ("Motion"). D.I. 9.

## I.   NATURE AND STAGE OF THE PROCEEDINGS

On October 1, 2010, Keurig filed its original complaint for, *inter alia*, patent infringement, trademark infringement, unfair competition, false advertising, trademark dilution and related Delaware state claims. D.I. 1. On October 18th, and prior to a response from Sturm, Keurig filed an Amended Complaint, D.I. 8, adding additional allegations of false advertising and unfair competition; Keurig concurrently filed a motion for a preliminary injunction. Sturm has moved to dismiss, in part, the Amended Complaint for failure to state a claim. D.I. 21.

## II.   SUMMARY OF THE ARGUMENT

Keurig's Motion is wholly based on Sturm's use of the descriptive use phrase "For use by owners of Keurig® Coffee makers" on packaging for cartridges of coffee which work only in Keurig coffee makers.

**1**. Keurig's trademark claims fail because Keurig cannot prove confusion likely, and, even if it could, Sturm's use of the KEURIG mark is fair use.

**2**. Keurig's false advertising claim is based on allegations of an implied claim which it cannot show was made, and even if it had been made, would not be false.

**3**. Keurig has failed to show irreparable harm absent an injunction; and the balance of harms and the public interest favor Sturm.

**4**. Keurig's equitable relief claims are barred by its unclean hands.

## III.   COUNTER STATEMENT OF FACTS

## A.   Keurig's Single-Serve Brewers and Beverage Cartridges

Keurig sells single-serve coffee machines and cartridges for use in them, that it calls "K-Cups" and advertises as containing a filter "to brew []coffee, tea and hot cocoa." Mandly Decl.

¶17, Ex. 33;[1] Wood Decl. ¶4 (D.I. 13). However, not all K-Cups contain filters as Keurig claims. Mandly Decl. ¶3; Hubert Decl. ¶32. Similarly, Keurig misrepresents the content or appearance of a number of the products sold in K-Cups. *See infra* at 19-20. Likewise, contrary to its assertion here that none of its cartridges contain instant coffee, *see* Wood Decl. ¶¶19, 20 (D.I. 13), its Café Mocha product does. Mandly Decl. ¶6, Ex. 7. Until Sturm entered the market, K-Cups were the only cartridges sold for Keurig brewers. Wood Decl. ¶16 (D.I. 13).

A Keurig brewer is used by opening its cartridge chamber, inserting a cartridge, and then closing the chamber cover. Hubert Decl. ¶¶12-13. As the chamber cover closes, the brewer automatically pierces the foil lid of the cartridge with a inlet probe and the bottom of the cartridge is pierced by an outlet probe. *Id.* The user can then initiate brewing. *Id.* Heated water is supplied to the cartridge via the inlet probe and the resulting beverage flows from the outlet probe to the user's cup. *Id.*

Keurig's brewers have a number of safety and convenience features relevant here. If liquid is unable to exit the cartridge, the water supply is automatically stopped. Hubert Decl. ¶35; Willard Decl. ¶28. Additionally, the brewing chamber of the Keurig brewer is configured to channel liquid escaping from a cartridge toward the cup and the brewer's integrated drip tray. Hubert Decl. ¶¶30-32; Willard Decl. ¶¶23-26.

**B.   Sturm's Coffee Cartridge**

In 2008, Sturm began developing an alternative to Keurig's K-Cup products. It invested more than $1,000,000 and almost 2 years to develop a blend of soluble and microground coffee,

---

[1] Declarations cited herein in Support of Defendant Sturm Foods, Inc.'s Answering Brief in Opposition to Keurig's Motion for Preliminary Injunction are filed contemporaneously herewith.

which is the subject of a pending patent application[2] and is sold in a cartridge designed for use in Keurig brewers. Beringause Decl. ¶¶5-6. In August 2010, Sturm launched its new product to retailers under the mark GROVE SQUARE ("G.S.") in distinctive packaging bearing the descriptive use phrase "For use by owners of Keurig® coffee makers" ("Sturm Use Statement"). *Id.* ¶9. By September 27, 2010, it was being sold by the Wal-Mart and Big Lots chains and today is sold in approximately 3,500 stores and online. *Id.* Through November 7, 2010, over 750,000 G.S. cartridges have been purchased by Wal-Mart customers alone. *Id.* ¶10.

Tests of more than 8,300 Sturm G.S. cartridges in Keurig brewers by Sturm, both before and since the G.S. retail launch, and by an independent test lab, Chemir Analytical Services/CAS MI Laboratories (collectively "CAS"), establishes the functional performance of the G.S. cartridges in Keurig machines and that they pose no threat of harm to consumers. Spreeman Decl. ¶¶6-13; Molden Decl. ¶¶4-19; Hubert Decl. ¶¶7-28; Willard Decl. ¶¶12-18. A review of the qualification, production, and independent testing demonstrates that the cartridges perform as intended more than 99.6 percent of the time. Spreeman Decl. ¶¶6-13; Molden Decl. ¶¶4-19; Hubert Decl. ¶¶7-28; Willard Decl. ¶¶12-18.

|  | Sturm Cartridges Tested | Failures | Success Rate | Failure Rate |
|---|---|---|---|---|
| **Qualification Testing** | 7,209 | 24 | 99.67% | 0.33% |
| **Production Testing** | 1,027 | 8 | 99.22% | 0.78% |
| **Independent Testing** | 143 | 0 | 100% | 0% |
| **Total** | **8,379** | **32** | **99.62%** | **0.38%** |

Pre-distribution qualification testing of 7,209 Sturm cartridges in Keurig brewers yielded only 24 failures, a 99.67 percent success rate. Spreeman Decl. ¶9. These results are consistent

---

[2] Microground coffee is finely ground coffee that when brewed in the Sturm cartridge provides flavor, aroma and texture. Starbucks' popular and recently introduced VIA® single-serve coffee product also contains a blend of soluble and microground coffee. Beringause Decl. ¶5. Soluble coffee is (and is understood to be) instant coffee. *See, e.g.,* Mandly Decl. ¶¶14-16, Exs. 30-32.

with the performance at market launch of similar dry beverage cartridge products that have been manufactured and sold by Sturm for many years. *Id.* Regular and next day testing of production G.S. cartridges is performed on Keurig brewers by Sturm's Quality Assurance and Sensory Evaluation groups. Molden Decl. ¶¶4-19. There have been only 8 failures in the 1,027 cartridge tests conducted in Keurig brewers by these groups from August 15 through November 1, 2010, confirming the G.S. cartridge performance. *Id.* at ¶10. Moreover, all eight failures (none were "delamination"[3] errors) occurred in the first week and no failure has occurred since August 30, 2010. *Id.*

Independent testing in a Keurig brewer conducted by CAS on 107 G.S. cartridges it purchased from retailers and 36 cartridges tested by Dr. Willard, had a 100 percent success rate, *i.e.,* no failures. Hubert Decl. ¶23; Willard Decl. ¶22. Additional tests conducted to simulate a "delamination" of a G.S. cartridge lid during brewing established that even if this were to occur, it would not pose a safety issue. Hubert Decl. ¶¶29-32; Willard Decl. ¶¶23-24.

## IV.   ARGUMENT

To obtain the extraordinary relief of a preliminary injunction, the moving party "must establish: '(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.'"  *QVC, Inc. v. Your Vitamins, Inc.*, C.A. No. 10-094-SLR, 2010 WL 2985801, at *4 (D. Del. July 27, 2010) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).  Keurig has failed to establish any of these factors.

---

[3] Keurig references cartridges with a lid failure defect as a "delamination" defect.  Pl. Br. at 17 (D.I. 11).

4

**A.      Keurig Is Not Likely To Succeed On The Merits Of Its Claims.**

**1.      Keurig's Trademark Infringement and Unfair Competition Claims Fail.**

For purposes of this Opposition, Sturm neither challenges (1) the protectability and validity of the KEURIG mark, nor (2) Keurig's ownership of the mark.  However, Keurig is unlikely to establish that confusion is likely, and, even if Keurig were to establish such fact, its claim is barred as protected nominative fair use.[4]

**a.      Keurig Has Failed To Show A Likelihood Of Consumer Confusion.**

Keurig cannot succeed because it has failed to establish that it is likely to prove that Sturm's use of the KEURIG mark in the Sturm Use Statement will result in a likelihood of consumer confusion as to the origin of Sturm's coffee cartridges.  In a traditional trademark infringement case, the Third Circuit determines likelihood of confusion with reference to:

> . . . a multi-factor test that assesses the following:  (1) degree of similarity between the owner's mark and the alleged infringing mark; (2) strength of the owner's mark; (3) price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) length of time the defendant has used the mark without evidence of actual confusion; (5) intent of the defendant in adopting the mark; (6) evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Century 21 Real Estate Corp.*, 425 F.3d at 224 (citations omitted) (factors collectively "*Lapp Factors*").  In cases (such as here) involving a nominative fair use claim, however:

---

[4] Because nominative fair use is an affirmative defense, a court generally need not decide the defense unless plaintiff proves likelihood of confusion. *See Century 21 Real Estate Corp. v. LendingTree, Inc.*, 425 F.3d 211, 222 (3d Cir. 2005).

. . . certain *Lapp* factors are either unworkable or not suited or helpful as indicators of confusion. That is because, by definition, nominative use involves use of *another's* trademark in order to describe the trademark owner's *own* product. Further, certain of the *Lapp* factors applied mechanically would inevitably point towards likelihood of confusion where no likelihood of confusion may actually exist. Thus, we must tailor the test to measure only those factors that are meaningful and probative in the context of nominative fair use.

*Id.* (original emphasis).

In nominative fair use cases, the Third Circuit has determined that the third, fourth, fifth and sixth *Lapp* Factors are "most relevant." *Id.* at 225-26. The first two *Lapp* Factors (similarity of respective marks and strength of plaintiff's mark) are "not appropriate" and "not really probative," respectively, in nominative fair use cases. *Id.* at 224-25. While consideration of the remaining factors is discretionary, *id.* at 225, in cases (such as this) involving directly competitive products, other *Lapp* Factors are likely to be no more appropriate or probative. *Id.*

<div align="center">

**(i)    Goods Are Not Impulse Purchases.**

</div>

The price of Keurig's products, alone, takes them out of the impulse purchase category. A typical K-Cup cartridge costs about $0.56, Pl. Br. at 11 (D.I. 11), which is twelve hundred percent (1200%) more expensive than conventional coffee.[5] Further, a Keurig at-home brewer can cost up to $250.00. *See* Mandly Decl. ¶10, Ex. 12. Keurig obtains these high prices by marketing to a select market segment, which Keurig identifies as "*gourmet coffee drinkers.*" *Id.* ¶8, Ex. 10 (emphasis added). A "gourmet" is "a connoisseur in eating and drinking"; a "connoisseur" is defined as "a discriminating judge or critique of something." *Webster's Third*

---

[5] Coffee made in a conventional household coffee maker costs approximately $0.04 per 6 fl. oz. cup. (0.042857 per 6 fl oz cup for Folgers pre tax ($10.29)). *See,* Mandly Decl. ¶7, Exs. 8-9.

*New International Dictionary, Unabridged* (Merriam-Webster ed. 2002).[6]   Keurig's target market, therefore, is intended to be more sophisticated and discriminating rather than the impulse purchaser, as Keurig claims in its motion.[7]

<div align="center">(ii)    <b>Actual Confusion Evidence and the Period of Sturm's Use.</b></div>

Keurig offers no evidence of actual consumer confusion. *See* Pl. Br. at 12 (D.I. 11). Sturm also is unaware of any instances of actual confusion. Beringause Decl. ¶11. Given the scope and extent of Sturm's product roll-out, *see supra* at 3, the absence of such actual confusion evidence could reasonably be said to disfavor finding likelihood of confusion. *Cf. Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 852 (D. Del. 2006) (even "limited" use of mark without actual confusion "slightly" favors defendant). However, as admitted by Keurig, *see* Pl. Br. at 12 (D.I. 11), at worst for Sturm, these factors do not support finding likelihood of confusion.

<div align="center">(iii)    <b>Sturm Has No Wrongful Intent.</b></div>

"The relevant question in [a nominative fair use] context is not whether the defendant intended to use the plaintiff's mark, which it always has in a fair use case, but whether it used the mark with the intent to confuse the public as to the relationship between the defendant and the plaintiff." *Century 21 Real Estate Corp.*, 425 F.3d at 227. "The plaintiff must show that the defendant intended the public to believe that the plaintiff endorsed or somehow supported its products or services." *Id.* Keurig primarily argues that Sturm's wrongful intent is evidenced by its use of a purportedly "hidden" disclaimer on the bottom panel of G.S. packaging. Pl. Br. at

---

[6] Mandly Decl. ¶9, Ex. 11.

[7] *Strike Holding LLC v. UC Strikes LLC*, No. 05-CV-1023, 2005 WL 1799412, at *7 (E.D. Pa. July 28, 2005) is inapposite because it involved inexpensive products.

<div align="center">7</div>

12-13 (D.I. 11).[8]  Far from being "hidden," the disclaimer is prominently displayed together with other important packaging elements, such as directions for use, "sell by" dating or recommended storage advice. *See* Wood Decl. ¶25 (D.I. 13); Beringause Decl. ¶9; Ex. 4 hereto.  Keurig and its affiliates also often place important, federally required labeling information on the bottom package panel. *See, e.g.*, Wood Decl. ¶29 (D.I. 13).  Moreover, Sturm flags the disclaimer with an asterisk on the Sturm Use Statement. *E.g.*, Ex. 3 hereto.

Keurig also erroneously argues that Sturm wrongfully copied Keurig's trade dress (although its trade dress claim is not the subject of this motion).  However, other than submitting a few specimens of its packaging, *see* Wood Decl. ¶29, Ex. 2 (D.I. 13), Keurig has not offered any evidence to establish that it owns a protectable trade dress. *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (must prove trade dress is (1) either inherently distinctive or has acquired secondary meaning, and (2) is non-functional).  Moreover, Keurig affirmatively argues that it does not use a unified trade dress, but rather many different marks, package designs, colors, etc. *See* Pl. Br. 14 (D.I. 11).[9]  In fact there is no coherent Keurig Trade

---

[8] Keurig's authorities are inapposite and distinguishable.  In *Charles of the Ritz Group Ltd. v. Quality King Distribs.*, 636 F. Supp. 433, 435, 436, (S.D.N.Y. 1986), defendant prominently and deceptively displayed plaintiff's mark, its packaging was similar to plaintiff's, and its disclaimer was not visible until the package was opened. *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 534-35, 538 (D.N.J. 2008), is a counterfeiting case where defendant was liable despite disclosing that the goods were "replicas." *Anheuser-Busch, Inc. v. Balducci Pubs.*, 28 F.3d 769, 774-76 (8th Cir. 1994), involves wholesale taking of plaintiff's marks, not fair use, and there was substantial actual confusion.  In *Cartier, Inc. v. Deziner Wholesale, LLC*, 55 U.S.P.Q.2d 1131, 1132-33, 1134-35 (S.D.N.Y. 2000), defendant's label most prominently displayed plaintiff's mark, and its use of plaintiff's mark was unwarranted.  In *Lorillard Tobacco Co. v. S&M Brands, Inc.*, 616 F. Supp. 2d 581, 584, 588-89 (E.D. Va. 2009), defendant prominently used a counterfeit of plaintiff's mark, and the court specifically held that, unlike the Third Circuit, the Fourth Circuit does not recognize nominative fair use.

[9] As an additional confusion "factor," Keurig relies upon its use of its many different "brands" "with different colors, names, and coffee flavors," to argue that consumers are more likely to erroneously believe that Sturm's coffee cartridges (the only cartridges not controlled by Keurig

Dress, *see* Mandly Decl. ¶11, Ex. 13 (depicting selection of Keurig packaging), and Keurig is unlikely to ever prove the existence of such a dress. *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1328-29 (varying purported trade dress elements disproves trade dress existence); *Pilot Corp. of Am. v. Fisher-Price, Inc.*, 344 F. Supp. 2d 349, 356 (D. Conn. 2004) (packaging too inconsistent to establish protectable trade dress).[10] Without establishing the existence of a trade dress, Keurig should not be heard to argue that Sturm wrongfully copied such dress.[11]

### (iv)   Balance Of *Lapp* Factors.

Contrary to the controlling law, *see supra* at 6, Keurig erroneously urges this Court to mechanistically apply the *Lapp* Factors to find likelihood of confusion. *See* Pl. Br. at 15 (D.I. 11) (confusion is inevitable because Sturm uses an identical mark for identical goods sold to identical consumers). However, when the appropriate *Lapp* Factors are weighed, Keurig fails to prove likelihood of confusion resulting from use of the Sturm Use Statement.

---

for use in its machines, *see* Wood Decl. ¶16 (D.I. 13)) originate with or are authorized by Keurig. It is well established, however, that consumer confusion arising simply through entry of a competitor into a market previously monopolized by plaintiff is not actionable as trademark infringement. *See Int'l Data Group, Inc. v. Ziff Davis Media, Inc.*, 145 F. Supp. 2d 422, 437-38 (D. Del. 2001). Keurig additional argument, that if a Sturm cartridge fails, consumers mistakenly will believe that Keurig is responsible for the failed product, Pl. Br. at 4 (D.I. 11), is nothing more than a reiteration of its erroneous argument that sale of a competitive Keurig-machine compatible cartridge will always cause confusion regardless of how marketed.

[10] To the extent that there are any common elements between Keurig's purported trade dress and Sturm's trade dress, such elements are either generic, or widely used for coffee products. *Compare* Am. Compl. ¶53 (D.I. 8), *with* Mandly Decl. ¶12, Exs. 14-28 (depicting common use of coffee beans, shaded flavor bars, single serve dispensers depictions, perforated packages, product stories, etc.).

[11] Keurig also baldly argues that Sturm's purported misrepresentations of compatibility with Keurig's machines evidences wrongful intent. Pl. Br. at 13 (D.I. 11). This is a *non sequitur*, and, as established *infra*, there is no such misrepresentation.

### b.    The Affirmative Defense of Fair Use Bars Keurig's Claims.

Sturm's G.S. cartridges work only in Keurig's machines. Sturm, therefore, uses the trademark KEURIG in the descriptive Sturm Use Statement on its packaging and depictions of it. This is Sturm's only consumer use of the KEURIG mark. Beringause Decl. ¶9; *see also* Pl. Br. at 3-4, 6-7, 8 (D.I. 11); Wood Decl. ¶¶25, 32 (D.I. 13). For the reasons discussed below, this use of "Keurig" is nominative fair use which bars Keurig's claims.

Nominative fair use is where a defendant uses the plaintiff's mark to refer to the plaintiff's goods in order to describe the defendant's own goods. *Century 21 Real Estate Corp.*, 425 F.3d at 220-21. Nominative fair use bars all relief to a plaintiff, even if the fair use results in a likelihood of consumer confusion. *See id.* at 232. "A nominative use defendant need only prove fairness" and "has no duty to negate confusion." *Id.* at 223, n. 3. The three-part nominative fair use test is:

> . . . a defendant must show: (1) that the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service; (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product; and (3) that the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services.

*Id.* at 222. Here, Sturm's use of KEURIG satisfies each element.

**Necessity for Description.** Keurig admits that "Sturm's cartridges have no other use except in Keurig's brewers." Am. Compl. ¶46 (D.I. 8); Wood Decl. ¶ 28 (D.I. 13). It is hardly surprising, therefore, that Sturm informs consumers (*i.e.*, owners of Keurig's single-serve machines) that Sturm's cartridges are for their use in Keurig machines. It is well established that where a party uses another's trademark to truthfully inform consumers that its product was created for use in or with the trademark owner's product, such use constitutes neither trademark infringement nor unfair competition. *See Century 21 Real Estate Corp.*, 425 F.3d at 219 (citing

*Volkswagenwerk AG v. Church*, 411 F.2d 350 (9th Cir. 1969) (auto repair shop could not be prevented from using VOLKSWAGEN and VW marks to inform consumers that it serviced such vehicles)); *Porter v. Farmers Supply Serv., Inc.*, 617 F. Supp. 1175, 1187 (D. Del. 1985) (summary judgment granted to defendant for use of plaintiff's mark to describe defendant's replacement blades for plaintiff's harvester). Moreover, "the court need not find that the use of the mark is indispensable in order to find this factor fulfilled. For, . . ., the Lanham Act does not compel a competitor to resort to second-best communication." *Century 21 Real Estate Corp.*, 425 F.3d at 229 (citation and quotation marks deleted); *see also id.* (quoting *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 307 (9th Cir. 1992) ("[I]t is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark.")).

Finally, Keurig admits by using the descriptive phrase "\*For use by owners of Keurig® coffee makers" that Sturm is informing consumers that Sturm's cartridges are for use with Keurig's single-serve machines.[12] *See* Am. Comp. ¶46 (D.I. 8). This is precisely the kind of use protected under the nominative fair use defense regardless of the presence of consumer confusion.

**Minimal Taking of Mark.** The second prong of nominative fair use is concerned with "the quantum [of defendant's] use of the attributes of plaintiff's mark." *Century 21 Real Estate Corp.*, 425 F.3d at 229-30 (citation and quotation marks deleted). In determining if defendant made use of only so much of plaintiff's trademark as is necessary to make nominative fair use, "[c]onsideration should be given . . . to the manner in which the mark is portrayed. For example,

---

[12] Keurig also equates Sturm's product description with its own, obviously descriptive packaging use of "For Use in Keurig® Brewing Systems." Pl. Br. at 6-7 (D.I. 11); *see also* Am. Compl. ¶¶ 53 & 59 (D.I. 8); Ex. 2 hereto (depictions of Keurig packaging).

did the defendant use plaintiff's distinctive lettering when using the plaintiff's mark or did the defendant, as in this case, simply use block letters to spell out plaintiff's names?" *Id.* at 230.

Keurig employs multiple distinctive displays of its KEURIG mark in connection with its cartridges. Wood Decl. ¶32, Ex. 2 (D.I. 13); Ex. 1 and Ex. 2 hereto. Sturm has not copied any Keurig distinctive display or design elements. Rather, Sturm displays the mark in a simple block letter typeface identical to that of the other words in the Sturm Use Statement, without any emphasis, in the lower left quadrant of the package. *See* Wood Decl. ¶25, Ex. 1 (D.I. 13); Ex. 3 hereto. Thus, Sturm minimized its use of the mark to that reasonably needed for fair use.

**Truthful and Accurate Statement.** Sturm's conduct and language reflect the parties' true and accurate relationship. The Sturm Use Statement accurately informs consumers that G.S. cartridges are intended for use in Keurig's machines, and flags with a "*" symbol the disclaimer "*Sturm Foods, Inc. has no affiliation with Keurig, Incorporated" which is prominently displayed on the bottom packaging panel with other important packaging elements. *Supra* at 7-8. There is nothing misleading about this statement. *Cf. Century 21 Real Estate Corp.*, 425 F.3d at 231 (requiring the district court to consider the disclaimer "LendingTree is not sponsored by or affiliated with the parent franchisor companies of any of the participating members of its network"). Further, Sturm's distinctive cartridge packaging prominently displays both its mark GROVE SQUARE & Design and the legend "MANUFACTURED BY STURM FOODS, INC.[,] MANAWA, WI 54949." *See* Beringause Decl. ¶9, Ex. 1.

For the foregoing reasons, Sturm's nominative fair use of plaintiff's KEURIG mark would not be actionable even if Keurig could establish likelihood of confusion.

### 2. Keurig Is Unlikely To Succeed On Its False Advertising Claim.

#### a. Keurig's Allegations of An Implied Claim Lack Support.

Keurig claims that Sturm is guilty of false advertising because of its use of the Sturm Use Statement, "For use by owners of Keurig® coffee makers."[13] To be actionable the Sturm Use Statement must be either literally false or shown by Keurig through valid and reliable consumer test results to make an implicit false claim. *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993); *QVC, Inc.*, 2010 WL 2985801, at *4. Keurig argues that the Sturm Use Statement is literally false by "necessary implication." This is not the case, however, and because Keurig fails to offer required supporting consumer evidence of the existence of the alleged implicit claim, it cannot prove that the Sturm Use Statement constitutes false advertising.

Keurig contends that the Sturm Use Statement means that more than that G.S. cartridges can be used in its brewers. Keurig contends it also has another meaning, but references this "other" meaning only with the vague phrases, "functionally suitable" or "work[s] normally." Pl. Br. at 17, 19 (D.I. 11). Keurig's further argument as to why the Sturm's Use Statement allegedly is false, however, discloses what this "other" meaning supposedly is.

Keurig argues falsity based on the contention that, in its purported testing of thirty G.S. cartridges, the percentage of G.S. cartridge defects failed to meet Keurig's cartridge design testing standard. Pl. Br. at 4, 17 (D.I. 11). This comparison shows Keurig's false advertising claim to be, in substance, that "For use by owners of Keurig® coffee makers" falsely implies that

---

[13] Keurig makes the same arguments in support of its claim that Keurig has engaged in unfair competition. In order to succeed on its false advertising claim, Keurig must prove *inter alia* that (1) Sturm has made false or misleading statements; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material; and (4) there is a likelihood of injury to the plaintiff. *See Johnson & Johnson-Merck Consumer Pharms. Co. v. Rohne-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994).

G.S. cartridges have the same defect rate as K-Cup cartridges or meet some internal Keurig quality standard. *Id.* at 17, 19. To prove that Sturm is making this implied comparative quality standard claim, however, Keurig needs reliable evidence that a substantial percentage of potential purchasers understood the implied claim to be made. *Johnson & Johnson-Merck Consumer Pharms.*, 19 F.3d at 133-34. Keurig has offered no such evidence.

Instead, Keurig argues that consumer evidence is unnecessary because its interpretation of the Sturm Use Statement is its literal meaning by "necessary implication," which does not require proof by consumer data. Pl. Br. at 16 (D.I. 11). As Keurig concedes, however, "necessary implication," requires that consumers understand the implied claim from the literal words used as readily "as if it [the necessarily implied claim] had been explicitly stated." *Id.* Yet, Keurig offers no evidence, or even a theory, as to why or how consumers necessarily would understand "[f]or use by owners of Keurig® coffee makers" to mean "GROVE SQUARE cartridges have the same defect rate as all K-Cups" or "meet Keurig's internal K-Cup quality standards."[14] Moreover, such a result is particularly unlikely because the G.S. package and product nowhere refers to "K-Cup," while Keurig products are prominently labeled as "K-Cup." *See J & M Turner, Inc.*, No. 96-CV-5819, 1997 WL 83766, at *3-4 (E.D. Pa. Feb. 19, 1997) (the claim "made to ASTM F959 [standard]," was not literally false because defendant's product failed the test plaintiff used to determine ASTM F959 compliance). Therefore, since Keurig is

---

[14] K-Cups have been sold under the following brands in recent years by Keurig and its licensees: GREEN MOUNTAIN, REVV, TULLY'S, COFFEE PEOPLE, TIMOTHY'S, EMERIL'S, WOLFGANG PUCK, DONUT HOUSE, GLORIA JEAN, CARIBOU, VAN HOUTTE. Wood Decl. ¶29 (D.I. 13); Mandly Decl. ¶11, Ex. 13. Keurig makes no attempt to establish all of these brands have the same defect rate, consumer knowledge of any defect rate, or Keurig's internal standard.

unable to prove the implicit claim it alleges to be false even exists, it cannot prove false advertising.

> **b.    Keurig's Test Evidence Should Be Given No Weight.**

Keurig's sole evidence of G.S. cartridges defects is the conclusory, self-serving declaration of its Vice President, Kevin Sullivan.  His declaration provides virtually no test information, *i.e.*, number of pre-tests, test procedures, coffee makers used, or why Keurig "established [QA] testing protocols" were not used.  It, therefore, should be given no weight. *See Blair v. Scott Specialty Gases*, 283 F.3d 595 (3d Cir. 2002).

Further, Keurig's purported G.S. test results are contrary to the results of many thousands of tests conducted by Sturm and CAS.  The overall failure rate in these tests was approximately 0.38%.  Spreeman Decl. ¶¶6-13; Molden Decl. ¶¶4-19; Hubert Decl. ¶¶7-28; Willard Decl. ¶¶13-22.  In addition, contrary to Keurig's assertions, "delamination" does not pose a significant scalding risk.[15]  CAS's tests disclosed that Keurig's machine is designed to prevent hot pressurized water from escaping "from the Keurig brewer . . . near its top" as Keurig claims occurred during its G.S. tests.  *See supra* at 4.  Instead, CAS found in simulating a "delamination," the water would, for the most part, end up in the coffee cup, and most of the balance otherwise is contained by the machine, *e.g.*, in the drip tray.  Hubert Decl. ¶¶29-32; Willard Decl. ¶¶23-26.  Thus, there is no risk of scalding or other injuries.  Hubert Decl. ¶¶29-32; Willard Decl. ¶¶23-26.

---

[15] During the October 26, 2010 teleconference with the Court, counsel for Sturm made a statement that could be understood to mean there had been no delaminations detected during any Sturm testing.  This is accurate for Sturm's Production and Sensory testing, as well as CAS testing.  Counsel subsequently has been informed there was at least one delamination among the 24 failures that occurred during the earlier qualification testing of over 7,000 cartridges and apologizes for any misunderstanding.

Likewise, Mr. Sullivan's assertion that 3 of the tested G.S. cartridges failed to automatically eject from a Keurig machine Sturm had not tested is refuted by CAS's testing of over 100 G.S. cartridges on a Keurig B3000SE machine (the only model currently offered that automatically ejects). Willard Decl. ¶9. In fact, not a single CSA tested cartridge exhibited any failure. Hubert Decl. ¶¶12-28; Willard Decl. ¶¶15-22.

### c.      There Is No Likelihood Of Injury To Keurig.

Even if Keurig could establish the alleged implicit comparative quality claim, and that it is false (which Keurig cannot), it has failed to establish any, much less irreparable, resulting injury. *See J & M Turner, Inc.*, 1997 WL 83766, at *5 ("falsity does not directly establish [the statement's] materiality or causal connection to [plaintiff's] injuries"). Keurig merely speculates that it will suffer lost goodwill from an association of scalding or other injuries, failed cartridges, or damaged machines caused by a Sturm cartridge. As shown above, however, there is no credible evidence that any of this is occurring, *supra* at 4, and there is absolutely *no* evidence that, if it did, consumers would blame Keurig. The differences in the respective brand names and packaging used for Sturm and K-Cup products, alone, would prevent this. In addition, the bottom of the G.S. packages conspicuously states: "Sturm Foods, Inc. has no affiliation with Keurig, Incorporated" in the same relative place on the package bottom as Keurig often user for its source identifier. *See supra* at 8. Moreover, it defies common sense that, if a Keurig machine user encounters a problem upon trying a new brand of cartridge, he or she will stop using the Keurig machine, rather than the new cartridge. Accordingly, Keurig has not established a likelihood of injury. *See McNulty v. Citadel Broadcasting Co.*, 58 Fed. Appx. 556, 566 (3d Cir. 2003) ("Lanham Act claims require proof of a nexus between the false statement and a third party's decision not to do business with the plaintiff.").

Nor is Keurig permitted a presumption of harm. Keurig's claimed presumption of "inevitabl[e] damage" arising from a two-party market misstates the decision on which Keurig relies, *Electronics Corp. of Am. v. Honeywell, Inc.*, 428 F.2d 191 (1st Cir. 1970). There, the court simply held that a competitor in a two-firm market has *standing* to bring a claim for false advertising that is not premised on trademark infringement, passing off, and product disparagement. *Id.* at 194.

**B.      Keurig Will Not Be Irreparably Harmed Absent An Injunction.**

"[T]he preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm." *Noasha LLC v. Nordic Group of Cos., Ltd.*, 630 F. Supp. 2d 544, 561 (E.D. Pa. 2009) (citing *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009)). Although trademark infringement can be presumed to cause irreparable injury, Keurig has not established a likelihood of success on its trademark claim. Thus, Keurig is not permitted a presumption of irreparable harm on that claim, as it contends. *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 174 (2d Cir. 2000).

Keurig also fails to establish irreparable harm on its advertising claim. Aside from its consumer confusion argument dealt with above, Keurig offers only speculation that the Sturm Use Statement will cause consumers to believe that any brewing problem is caused by the machine, rather than the cartridge. Tellingly, Keurig fails to explain why consumers would reach such a conclusion and not simply try a different cartridge. Moreover, as shown above, G.S. cartridges have a miniscule defect rate. *Supra* at 3-4.

**C.      The Balance Of Harms And Public Interest Favors Sturm, Not Keurig.**

The balance of harms and public interest also weigh against Keurig. To prevail, Keurig must quantify the harm it will suffer without an injunction. *See Abbott Labs. v. Andrx Pharms.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006), and demonstrate that "granting the requested relief will

[not] result in even greater harm" to Sturm. *W.L. Gore & Assocs., Inc. v. Johnson & Johnson*, 882 F. Supp. 1454, 1460-1461 (D. Del. 1995) (citing *SI Handling Sys. Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir. 1985)) (denying a preliminary injunction motion that would cause market withdrawal of defendant's product).   Here, the only "harm" Keurig faces is the threat of competition to its monopoly position for cartridges used in its machines.

Further, Keurig misrepresents the relevant facts regarding the balance of harm.   Keurig states in its October 18, 2010 brief that Sturm's product has only been on the shelves for a few days.  Pl. Br. at 3, 12, 20 (D.I. 11).   In fact, however, Keurig has known since, at least, October 8, 2010 that Sturm's product has been on retail shelves since September.[16]   Mandly Decl. ¶13, Ex. 29.  Likewise, Keurig disingenuously states that Sturm's product is in only a few stores.  Pl. Br. at 3, 20 (D.I. 11).   In fact, G.S. products are in over 3,500 stores.  This includes the over two hundred stores Price Chopper chain, which Keurig knew carried G.S. products when it filed its instant motion.   Critically, enjoining the Sturm Use Statement would leave Sturm with no meaningful way to describe the use of its product and therefore, effectively prevent it from competing.[17]   "The injunctive power of the courts should not be misused by manufacturers attempting to stifle the free market that is the cornerstone of our economy.   Courts should therefore be wary of producers' pleas for injunctive relief against the advertisements of their close competitors."  *Pharmacia Corp. v. GlaxoSmithKline Consumer Heathcare, L.P.*, 292 F. Supp. 2d 594, 610 (D.N.J. 2003).

---

[16] Keurig's allegation that Sturm ignored correspondence regarding Keurig's potential claims similarly misstates the record.  Sturm only received notice of Keurig's claims upon service of the complaint.  *See* Beringause Decl. ¶12.

[17] Keurig uses a similar "for use in" phrase on its packaging, *supra* n. 11, showing the need for such an explanation.

Finally, where a "plaintiff has not shown that it will likely succeed on the merits, the public's interest is not served by taking a competitive and valuable product out of the market place." *Int'l Data Group, Inc.*, 145 F. Supp. 2d at 441 (denying preliminary injunction motion). Since Keurig is not likely to succeed on the merits, it is not in the public interest to eliminate its only cartridge competitor.

**D.     Keurig's Claims Are Barred By The Doctrine of Unclean Hands.**

Where a plaintiff acts inequitably with respect to the subject matter of the plaintiff's claim, the plaintiff should be denied equitable relief. *See Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 855 (3d Cir. 1984); *see also Clinton E. Worden & Co. v. Cal. Fig Syrup Co.*, 187 U.S. 516, 528 (1903).   Here, Keurig, not Sturm, is the party engaged in false advertising respecting cartridges and the products inside them.   Specifically, Keurig misrepresents that: 1) all K-Cups contain filters; 2) its Gloria Jean's Cappuccino product makes a frothy milk beverage; and 3) certain K-Cup products ingredients.

Keurig's machine website and packaging represent, respectively, that the K-Cup contains a "technically advanced filter for maximum flavor extraction" and the "interior filter assures superior brewing results." Mandly Decl. ¶17, Ex. 33; Wood Decl. ¶4 (D.I. 13).   However, not all K-Cups contain filters.   Specifically, Keurig offers numerous K-Cups products cartridges without filters, including the Café Mocha, which is an instant coffee product. *Supra* at 2, Mandly Decl. ¶¶3, 6, Ex. 7.[18]

---

[18] Also, Keurig falsely asserts in this action that it "has not offered and does not offer instant coffee cartridges," Pl. Br. at 3 (D.I. 11), and that "instant coffee is not brewed coffee." *Id.* at 7. However, Keurig's authorized Café Mocha coffee product contains only instant coffee and its product packaging specifically states "[a]fter brewing Café Escapes™ K-Cups® are hot and may drip." Mandly Decl. ¶6, Ex. 7. Keurig nowhere explains why its instant coffee is "brewed," but claims Sturm's product, which also contains ground, albeit microground, coffee, is not brewed.

19

In addition, Keurig's Gloria Jean's Cappuccino packaging prominently depicts photographs of a frothy beverage on almost every panel, which is likely to cause consumers to believe that the product contains a milk ingredient. Mandly Decl. ¶4, Ex. 1. However, the product contains no milk ingredient, but only "100% Arabica Coffee with natural and artificial flavoring," and, when prepared, does not appear anything like the "frothy" picture. *See id.* ¶4, Exs. 1, 2.

Finally, several different varieties of the Green Mountain flavored coffee packaging which bear the statement "100% ARABICA COFFEE," also contain undisclosed flavoring ingredients. *See* Mandly Decl. ¶5, Exs. 3-6. Keurig's failure to list all the ingredients on their packaging violates applicable FDA regulations. *See* 21 C.F.R. §§ 101.2, 101.4.

## V.   **CONCLUSION**

Sturm respectfully requests that Keurig's motion for preliminary injunction be denied in all respects, and for such other relief as this Court deems just and equitable.

<div style="margin-left: 40%">Respectfully submitted,</div>

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Craig S. Fochler
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Tel: (312) 832-4500

By: */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

Allen A. Arntsen
FOLEY & LARDNER LLP
Verex Plaza
150 East Gilman Street
Madison, WI 53703
Tel: (608) 257-5035

*Attorneys for Defendant Sturm Foods, Inc.*

Dated: November 9, 2010
989060 / 35644

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 9, 2010, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on November 9, 2010, the attached document was Electronically Mailed to the following person(s):

Karen Elizabeth Keller
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
kkeller@ycst.com

Gerald B. Hrycyszyn
Michael A. Albert
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
ghrycyszyn@wolfgreenfield.com
malbert@wolfgreenfield.com

By:    /s/ David E. Moore
       Richard L. Horwitz
       David E. Moore
       POTTER ANDERSON & CORROON LLP
       Tel: (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore@potteranderson.com

987174/35644