IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KEURIG, INCORPORATED,

Plaintiff,

v.

STURM FOODS, INC.,

Defendants.

Civil Action No. 10-00841-SLR

**KEURIG, INCORPORATED'S OPPOSITION TO
STURM FOODS, INC.'S MOTION TO STRIKE**

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

OF COUNSEL:
Michael A. Albert
malbert@wolfgreenfield.com
Gerald B. Hrycyszyn
ghrycyszyn@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

*Attorneys for Plaintiff Keurig, Incorporated*

Dated:  December 10, 2010

## TABLE OF CONTENTS

I.   THE EVIDENCE OF ACTUAL CONFUSION AND THE DEFECTIVE NATURE OF STURM'S CARTRIDGES SUBMITTED WITH KEURIG'S REPLY WERE UNAVAILABLE AT THE TIME OF KEURIG'S ORIGINAL FILING ............................ 4

    A.   KEURIG'S EVIDENCE OF ACTUAL CONFUSION IS THE MOST RELEVANT INFORMATION IN ASSESSING LIKELY CONFUSION ........................................... 5

    B.   HEARSAY IS ADMISSIBLE TO SUPPORT A PRELIMINARY INJUNCTION .............................. 9

    C.   THE COURT CAN CONSIDER INTERNET POSTINGS .......................................... 10

II.  THE EXPEDITED NATURE OF KEURIG'S ORIGINAL FILING PRECLUDED EXTENSIVE TESTING, BUT STURM'S MISLEADING TEST RESULTS INDICATE A NEED FOR CONSIDERATION OF KEURIG'S INDEPENDENT TEST LAB RESULTS ............................................................................... 11

    A.   THE ADDITIONAL TEST RESULTS AND SULLIVAN DECLARATION ARE RESPONSIVE TO NEW ISSUES RAISED IN STURM'S RESPONSE ...................................... 13

    B.   TO THE EXTENT THE COURT CONSIDERS THE ADDITIONAL TEST RESULTS AND SULLIVAN DECLARATION TO BE NEW EVIDENCE, THE COURT SHOULD NOT STRIKE THIS INFORMATION, BUT ADMIT STURM'S SURREPLY INSTEAD ...................... 16

    C.   THE SOTO DECLARATION PROVIDES RELIABLE INDEPENDENT TESTING EVIDENCING THE DEFECTS EXHIBITED BY STURM'S CARTRIDGES .............................. 17

III. THE ACTUAL STURM PACKAGING PROVIDED WITH KEURIG'S REPLY IS NOT CUMULATIVE .................................................................................. 19

IV.  STURM'S REQUEST FOR ORAL ARGUMENT ............................................................ 19

V.   SUMMARY .................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**

Builder's Best, Inc. v. Lowe's Companies, Inc.,
    No. 1:03-CV-907, 2005 WL 3262408 (W.D. Mich. Nov. 30, 2005) ........................................ 3

Burnham v. City of Rohnert Park,
    No. C 92-1439, 1992 WL 672965 (N.D. Cal. May 18, 1992) ...................................................... 5

Century 21 Real Estate Corp. v. Lendingtree, Inc.,
    425 F.3d 211 (3d Cir. 2005) ........................................................................................... 6, 9

DeCosta v. CBS, Inc.,
    520 F.2d 499 (1st Cir. 1975) ............................................................................................... 4

First Specialty Ins. Corp. v. 633 Partners, Ltd.,
    300 Fed. Appx. 777 (11th Cir. 2008) ................................................................................... 13

Flynt Distributing Co. v. Harvey,
    734 F.2d 1389 (9th Cir. 1984) ................................................................................... 9, 11, 16

Grantz v. State Farm Mutual Auto. Ins.,
    No. SACV 08-0855 AG, 2009 WL 2870158 (C.D. Cal. Sept. 2, 2009) .................................... 13

Hayes v. Dye,
    No. 2008-165 (WOB), 2010 WL 3515578 (E.D. Ky. Sept. 2, 2010) ........................................ 3

Hockett v. Columbia/HCA Healthcare Corp.,
    489 F. Supp. 2d 25 (D. D.C. 2007) ................................................................................. 3, 16

Int'l Data Group, Inc. v. Ziff Davis Media, Inc.,
    145 F. Supp. 2d 422 (D. Del. 2001) ...................................................................................... 7

Kos Pharmaceuticals, Inc. v. Andrx Corp.,
    369 F.3d 700 (3d Cir. 2004) ..................................................................................... 9, 11, 16

Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,
    799 F.2d 867 (2d Cir.1986) ................................................................................................. 4

Pimentel & Sons Guitar Makers, Inc. v. Pimentel,
    229 F.R.D. 208 (D. N.M. 2005) ..................................................................................... 3, 5, 16

QVC, Inc. v. Your Vitamins, Inc.,
    714 F. Supp. 2d 291 (D. Del. 2010) ..................................................................................... 10

Rodan & Fields, LLC v. Estee Lauder Co.,
    No. 10-CV-02451-LHK, 2010 WL 3910178 (N.D. Cal. October 5, 2010) ................................. 5

Sabinsa Corp. v. Creative Compounds, LLC,
   609 F.3d 175 (3d Cir. 2010) ................................................................................. 6

Sierra Club, Lone Star Chapter v. Federal Deposit Insurance Corp.,
   992 F.2d 545 (5th Cir. 1993) ....................................................................... 9, 11, 16

Telecomm Technical Serv., Inc. v. Siemens Rolm Commc'ns, Inc.,
   172 F.R.D. 532 (N.D. Ga. 1997) ............................................................................ 3

University of Texas v. Camenisch,
   451 U.S. 390 (1981) ............................................................................................ 11, 16

Volkswagen AG v. Verdier Microbus and Camper, Inc.,
   No. C 09-00231 JSW, 2009 WL 928130 (N.D. Cal. April 3, 2009) ......................... 10

Keurig filed its motion for a preliminary injunction **within days** of the "early October" national release of the Sturm cartridges.[1] Sturm now seeks to keep some of the most compelling evidence from the Court solely because Keurig had to move expeditiously to bring its motion so as to prevent harm to Keurig's goodwill and reputation. Much of this information did not **even exist** at that point, and was thus properly added to the record as soon as it became available. Any effect on Sturm can be, and has been, remedied by giving Sturm the opportunity to file a surreply (which Keurig offered to assent to but Sturm insisted on motion practice).[2] Keurig seeks only to provide the Court with the information it will need to make an informed decision on the motion for preliminary injunction.

The **majority** of the evidence of actual confusion submitted with Keurig's reply **is dated after the October 18th filing** of Keurig's motion for a preliminary injunction. **Keurig could not have submitted such evidence with its original filing because it did not exist at that time.** Yet, the fact that Sturm's cartridges had already confused actual consumers in that short time is highly probative of likely confusion. Indeed, **all** of the evidence of actual confusion submitted with Keurig's reply **is dated October 14, 2010 or later**. Since the evidence at issue did not even come into existence until after Keurig's motion (or immediately before it, in the narrow four-day window between October 14th and 18th), and given the high degree of materiality that evidence of actual confusion has in the analysis of trademark infringement, the

---

[1] See Declaration of Eric H. Beringause in Support of Sturm's Opposition ("Beringause Decl."), D.I. 27, ¶ 8 (stating the Sturm cartridges were available in only a few states, none of them in the Northeast prior to "early October"). Keurig searched for the Sturm products in the Northeast, where it is headquartered, but could not find them until about October 11th, when they became available nationally. Shortly thereafter Keurig filed its motion for a preliminary injunction.

[2] Keurig does not oppose Sturm's request to file a surreply. Indeed, Keurig advised Sturm that it would assent to Sturm's filing of a surreply before Sturm filed this motion. See Declaration of Gerald B. Hrycyszyn in Support of Keurig's Opposition to Sturm's Motion to Strike ("Second Hrycyszyn Decl.), submitted with this responsive brief, ¶¶ 2-3, Ex A.

Court should consider this evidence.

Sturm's refusal to cooperate – including its non-responses to two cease and desist letters, nondisclosure of when and where it would launch its product, and refusal to share test results was calculated to make it difficult for Keurig to seek legal redress.[3]  Had Keurig delayed filing for a preliminary injunction until after discovery, Sturm would no doubt be arguing that the motion was too late.  Now, instead, it seeks to exclude highly relevant testimony including independent test results and first-hand declarations of witnesses.  Its motion should be denied.

Keurig's need for expedited filing precluded extensive testing of the Sturm cartridges. Keurig did, however, conduct expedited preliminary testing which indicated that Sturm's cartridges were dangerously defective and could cause serious damage to Keurig's customers, brewers, and reputation.[4]  To prevent this irreparable harm, Keurig filed its motion for a preliminary injunction based, in part, on that expedited testing.  It had asked Sturm for its test results, but Sturm refused.  Accordingly, Keurig submitted, with its reply, more extensive independent test data on the performance and failure rates of Sturm and Keurig cartridges.  This unbiased test data will aid the Court in analyzing the issues presented in the motion for preliminary injunction.  Moreover, these test results address issues raised, for the first time, in Sturm's responsive brief.  For example, the misleading test results submitted with Sturm's response indicate a need for the unbiased independent testing provided with Keurig's reply.

When Keurig filed its motion for a preliminary injunction, it was concerned that

---

[3] Prior to filing its complaint, Keurig attempted to contact Sturm regarding this dispute.  Sturm never responded.  Despite Keurig's objections, Sturm forged ahead with sales of its defective product.  See Declaration of Gerald B. Hrycyszyn in Support of Keurig's Motion for Preliminary Injunction, D.I. 12, ¶ 4, Ex. 3; see also Section II, herein.

[4] See Opening Brief in Support of Keurig's Motion for Preliminary Injunction ("Keurig's Opening Brief"), D.I. 11, 4-5, 17-18; Declaration of Kevin Sullivan in Support of Keurig's Motion for Preliminary Injunction ("Sullivan Opening Decl."), D.I. 14, ¶¶ 2-22.

consumers would be confused into believing that Sturm's cartridges were Keurig's, harming Keurig's reputation. In fact, Keurig's fears have proved correct. Consumers are actually confused – Sturm's packaging has led consumers to believe that Sturm cartridges are sold by Keurig or otherwise affiliated with or endorsed by Keurig. Moreover, consumers are experiencing the kinds of serious failures the independent test results showed, including delaminations, when they try to use Sturm's cartridges in Keurig's brewers. As one consumer warned: "This product should be pulled from the market . . . [T]he top of the k-cup failed to stay secure, resulting in **coffee spewing out of the Keurig coffee maker**."[5]

In circumstances like this, especially in the context of a preliminary injunction, courts routinely favor allowing the supplemental evidence (and granting defendant a surreply opportunity, which Sturm has already taken). See, e.g., Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 229 F.R.D. 208, 210-11 (D. N.M. 2005) (denying a motion to strike new evidence submitted in a reply in support of a preliminary injunction for trademark infringement and allowing defendant to file a surreply instead).[6] Any prejudice to Sturm from introduction of this

---

[5] See Declaration of Chelsea A. Loughran in Support of Keurig's Motion for Preliminary Injunction ("First Loughran Decl."), D.I. 36, ¶¶ 4-5, Ex. B (emphasis added).

[6] See also Hockett v. Columbia/HCA Healthcare Corp., 489 F. Supp. 2d 25, 35 (D. D.C. 2007) ("the Court is loathe to strike a brief, especially when the better course is to grant the request for leave to file a surreply, so that a complete record may be considered"); Hayes v. Dye, No. 2008-165 (WOB), 2010 WL 3515578, at * 13 (E.D. Ky. Sept. 2, 2010) (denying a motion to strike a new argument submitted in a reply brief – the "simple remedy of allowing Plaintiff additional time and granting leave to file a sur-reply is preferable and more pragmatic than the extreme remedy of striking part of a written brief."); Builder's Best, Inc. v. Lowe's Companies, Inc., No. 1:03-CV-907, 2005 WL 3262408, at *7 (W.D. Mich. Nov. 30, 2005) (denying a motion to strike new arguments and new evidence in a reply – "If [plaintiff] wished to respond to information or arguments which it truly believed were new, the better course would have been to simply move for leave to file a surreply. Although motions to strike matters from pleadings are recognized by the rules . . . motions to strike portions of briefs are generally not favored."); Telecomm Technical Serv., Inc. v. Siemens Rolm Commc'ns, Inc., 172 F.R.D. 532, 540 (N.D. Ga. 1997) (holding that the equities favor allowing a surreply to respond to additional evidence in a response, instead of striking that additional evidence).

highly relevant information in Keurig's reply has been cured by the surreply Sturm filed with its motion.

## I. THE EVIDENCE OF ACTUAL CONFUSION AND THE DEFECTIVE NATURE OF STURM'S CARTRIDGES SUBMITTED WITH KEURIG'S REPLY WERE UNAVAILABLE AT THE TIME OF KEURIG'S ORIGINAL FILING

Keurig moved for a preliminary injunction on an expedited basis to prevent harm to its hard-earned reputation arising from Sturm's unauthorized use of Keurig's trademark in a manner that demonstrably confuses consumers.[7]  Keurig filed its motion on October 18th, **within days** of the "early October" national release of the Sturm cartridges.[8]  As of that date, the defective Sturm cartridges were already causing actual confusion and frustration.  Keurig learned of these instances shortly after they occurred (with a slight time lag due to the time required for consumers to post on the Internet complaints about their negative experiences with the Sturm cartridges, and for Keurig to find those complaints).

The majority of the evidence of actual confusion and frustration with the defective Sturm cartridges submitted with Keurig's reply is dated **after the October 18th filing** of Keurig's motion for a preliminary injunction.  For example, Ms. Dawn Moncey had not posted her complaint about the defective Sturm cartridges on eBay until November 2, 2010.[9]  Therefore, Keurig could not have obtained her declaration until after the filing of its opening brief.

---

[7] "It would be unfair to penalize [a plaintiff] for acting to protect its trademark rights before serious damage has occurred."  Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986); see also DeCosta v. CBS, Inc., 520 F.2d 499, 514 (1st Cir. 1975) ("Plaintiff should not be expected to stand by and await the dismal proof [of actual confusion].")

[8] See supra note 1.

[9] See First Loughran Decl., D.I. 36, ¶¶ 2-3, Ex. A; see also Declaration of Dawn Moncey in Support of Keurig's Motion for Preliminary Injunction ("Moncey Decl."), D.I. 34; Declaration of Chelsea A. Loughran in Support of Keurig's Opposition to Sturm's Motion to Strike, submitted with this responsive brief (Second Loughran Decl.) ¶¶ 2-4 (explaining that Ms. Loughran, on November 4, 2010, contacted Ms. Moncey immediately after seeing her eBay post by "dawnm24", dated November 2, 2010, and asked her if she would be willing to provide a declaration detailing her experience with the Sturm cartridges).

**Similarly, Keurig could not have submitted any of the other evidence of actual confusion and frustration with the defective Sturm cartridges that is dated after October 18th with its original filing because it did not exist at that time.** Accordingly, such evidence should be admitted.[10]

Indeed, all of the consumer evidence submitted with Keurig's reply is dated October 14, 2010 or later.[11]

Given the importance of evidence of actual confusion in the analysis of trademark infringement, under these circumstances, the Court should admit this evidence. Any prejudice to Sturm from introduction of this highly relevant information in Keurig's reply has been cured by the surreply Sturm filed with its motion.[12]

### A.   KEURIG'S EVIDENCE OF ACTUAL CONFUSION IS THE MOST RELEVANT INFORMATION IN ASSESSING LIKELY CONFUSION

That Sturm's cartridges have already confused actual consumers is highly probative, considering that they have been available for only a short time. The Third Circuit deems

---

[10] See, e.g., Burnham v. City of Rohnert Park, No. C 92-1439, 1992 WL 672965, at * 5 (N.D. Cal. May 18, 1992) ("reply briefs are limited in scope to matter either raised by the opposition **or unforeseen at the time of the original motion**") (emphasis added). The cases cited by Sturm are inapposite. In Rodan & Fields, LLC v. Estee Lauder Co., the court did not allow a party to introduce, in its reply brief, evidence from its own employee and consultant who were clearly available to provide it in the opening brief. No. 10-CV-02451-LHK, 2010 WL 3910178, at *4 (N.D. Cal. October 5, 2010). That case and all the other cases cited by Sturm in support of its motion to strike involve arguments a party could have made and evidence that a party could have submitted with its opening brief. None of the cases Sturm cites exclude evidence, like here, that either did not exist or was reasonably not found (because of the short time frame it existed it prior to the filing of the opening brief).

[11] See First Loughran Decl., D.I. 36, ¶¶ 2-11, Exs. A-E; Moncey Decl., D.I. 34; Declaration of Wendy Buck in Support of Keurig's Motion for Preliminary Injunction ("Buck Decl."), D.I. 35; Second Loughran Decl., ¶¶ 5-7 (explaining that Ms. Loughran , on November 4, 2010, contacted Ms. Buck immediately after seeing her eBay post by "kirbyskitchen", dated October 14, 2010, and asked her if she would be willing to provide a declaration detailing her experience with the Sturm cartridges).

[12] See, e.g., Pimentel, 229 F.R.D. at 210-11; see also supra note 6.

"evidence of actual confusion" to be one of the factors "**most relevant** in assessing likely confusion" in the nominative fair use context. <u>Century 21 Real Estate Corp. v. Lendingtree, Inc.</u>, 425 F.3d 211, 225-6 (3d Cir. 2005) (emphasis added); <u>see also</u> <u>Sabinsa Corp. v. Creative Compounds, LLC</u>, 609 F.3d 175, 187 (3d Cir. 2010) (evidence of actual confusion is not required, as it is "frequently difficult to find"; but where it **is** found, it is "**highly probative** of a likelihood of confusion") (emphasis added).   Accordingly, the evidence of actual confusion submitted with Keurig's reply is important information that the Court should consider.[13]

Inexplicably, Sturm argues that the Moncey Declaration "fails to establish such source confusion" and should be struck as irrelevant.[14]   Yet, Ms. Moncey clearly states she was confused by Sturm's statement "for use by owner's of Keurig® coffee makers" and that she purchased the Sturm cartridges under the incorrect understanding that they were Keurig's cartridges:

> Sometime around November 2, 2010 **I bought two boxes of what I thought were Keurig K-Cups** at a Wal-Mart in St. Peters, Missouri -- one was a Keurig hazelnut coffee, and **the other was a Grove Square coffee**. Although I hadn't purchased Grove Square coffee before, **I noticed that the Grove Square box said that it was "for use by owners of Keurig® coffee makers." I believed that the Grove Square coffee was just like the other Keurig hazelnut coffee I was purchasing at the same time. I thought it was Keurig's coffee.**[15]

Ms. Moncey did not realize that the Sturm cartridges were **not** made by Keurig until after she

---

[13] Keurig is not arguing Sturm infringes its K-CUP® mark (and, therefore, need not "plead" those marks). <u>See</u> Sturm's Brief in Support of Its Motion to Strike ("Motion to Strike"), D.I. 43, 8-9. Keurig uses its K-CUP® mark only to explain how consumers are actually confused about the source of Sturm's cartridges and refer to them as Keurig's K-CUPS®.

Sturm has nothing to support its argument that Keurig's trademarks for K-CUP® are generic. <u>See id.</u> Prior to Sturm's introduction of its cartridge, there were no non-Keurig branded or licensed cartridges available for use with Keurig brewers.   The  K-CUP® mark has not gone generic, and Sturm offers no evidence that it has.

[14] Sturm's Motion to Strike, D.I. 43, 10-11.

[15] Moncey Decl., D.I. 34, ¶ 2 (emphasis added)

had a terrible experience with the Sturm cartridges.  She explains:

> I later tried to use the Grove Square K-Cups with my home Keurig coffee maker.
> I tried making a cup of coffee but nothing happened . . That happened with three
> or four of the first eight cartridges I tried.  **At first I thought my Keurig brewer
> was broken** . . . When I finally got one of the Grove Square coffee K-Cups to
> work, I was even more upset because the coffee tasted really poorly.  It was
> watered-down and didn't taste like coffee at all.  It definitely did not taste like the
> coffee I expect when I use my Keurig brewer.  **By this point, I inspected the
> packaging very carefully and learned that Grove Square is made by Sturm
> Foods, Inc. and I noticed the small disclaimer on the bottom of the box
> indicating that Sturm Foods is not affiliated with Keurig, Inc.**[16]

As Ms. Moncey clearly states, she purchased the Sturm cartridges under the mistaken belief that

they were Keurig cartridges.  It was not until some time later, when she tried to use the defective

Sturm cartridges at home and the first three failed to make any beverage at all and the fourth

made a beverage that tasted poorly, did she study the Sturm packaging very carefully to decipher

Sturm as its source.  The fact that Ms. Moncey purchased the Sturm cartridges and tried to use

the defective Sturm cartridge under the mistaken belief that they were Keurig cartridges, is

strong evidence of actual confusion.[17]

Similarly, Sturm argues that the Buck Declaration "fails to establish such source

confusion" and should be struck as irrelevant.[18]  Yet, the Buck Declaration, like the Moncey

Declaration, clearly indicates that Ms. Buck was confused and purchased the Sturm cartridges

under the incorrect understanding that they were Keurig's cartridges:

> **When I purchased the Grove Square single-serve cartridges I thought that
> they were just like all of the other K-Cup varieties that I had tried in the
> past.  I thought the Grove Square cartridges were either made by Keurig or
> authorized by Keurig to be used in Keurig's brewers** like the Timothy's World

---

[16] Id. at ¶¶ 4-8 (emphasis added).

[17] As Keurig discussed in its reply brief, the issue here is not competition; it is Sturm's use of the
KEURIG mark in a manner that will confuse consumers as to the relationship between Sturm,
Keurig and each of their products.  Int'l Data Group, Inc. v. Ziff Davis Media, Inc., 145 F. Supp.
2d 422 (D. Del. 2001), cited in Sturm's motion to strike (D.I. 43 at 10), is simply not on point.

[18] See Sturm's Motion to Strike, D.I. 43, 10-11.

Coffee K-Cups or the Green Mountain Donut House K-Cups I usually use.[19]

Ms. Buck did not come to the realization that the Sturm cartridges were **not** made by Keurig until after she discovered that the Sturm cartridges contained instant coffee instead of fresh brewed coffee as she expected.  She explains:

> When I tried a cup of coffee made using the Grove Square K-Cups, it was terrible. The coffee was awful.  I was very disappointed with the quality and the taste of the coffee.  I suspected that the Grove Square K-Cups had instant coffee . . . I was extremely disappointed with this because I was expecting to enjoy a cup of fresh-brewed coffee as I always do with the various K-Cups I purchase.  Instead I was left with awful-tasting instant coffee . . . **When I purchased the Grove Square K-Cups I did not notice the disclaimer on the bottom of the box.  It was not until I had a terrible cup of coffee and was trying to figure out where to send my complaint did I notice it.**[20]

As Ms. Buck clearly states, she purchased the Sturm cartridges under the mistaken belief that they were Keurig cartridges.  It was not until some time later, when she took a closer look at the Sturm packaging to determine where to send her complaint, that she realized Sturm's Grove Square cartridges were not Keurig coffee cartridges.  That Ms. Buck purchased the Sturm cartridges and tried to use them under the mistaken belief that they were Keurig cartridges is strong evidence of actual confusion.

Accordingly, the evidence of actual confusion submitted with Keurig's reply is important information that the Court should consider in deciding Keurig's motion for a preliminary injunction.  For example, this evidence clearly establishes that Sturm's packaging fails to meet its obligation to reflect the true and accurate relationship between Keurig and Sturm's cartridges. This negates Sturm's "fair use" defense because consumers like Ms. Buck and Ms. Moncey were

---

[19] Buck Decl., D.I. 35, ¶ 3 (emphasis added).

[20] Id. at  ¶¶ 6-12 (emphasis added).

led to believe that Sturm's cartridge was made or licensed by Keurig.[21]

## B.    HEARSAY IS ADMISSIBLE TO SUPPORT A PRELIMINARY INJUNCTION

Sturm incorrectly argues that the First Loughran Declaration (D.I. 36) and the customer comments submitted with that declaration are inadmissible as hearsay. "[A]t the preliminary injunction stage, the procedures in the district court are less formal, and **the district court may rely on otherwise inadmissible evidence, including hearsay evidence.**" Sierra Club, Lone Star Chapter v. Federal Deposit Insurance Corp., 992 F.2d 545, 551 (5th Cir. 1993) (emphasis added).

Indeed, the Third Circuit has specifically held that hearsay evidence of actual confusion is admissible in the context of a motion for preliminary injunction for trademark infringement. See Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 718 (3d Cir. 2004); see also Flynt Distributing Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) ("[Defendants] argue that [Plaintiff's] evidence is hearsay. The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."). Keurig's motion for preliminary injunction is exactly the kind of urgent filing in which these "less formal"

---

[21] Any disclaimer on the accused product's packaging must "reflect the true and accurate relationship between plaintiff and defendant's products." Century 21, 425 F.3d at 231. The Third Circuit indicated a disclaimer should be considered in a court's evaluation of fair use, but did not provide guidance on whether a disclaimer would be adequate or how prominent such a disclaimer must be in order to establish fair use. Id. at 231. Indeed, in that case, the disclaimer stated "[Defendant] is not **sponsored by or affiliated** with the [Plaintiff] companies of any of the participating members of its network" indicating that more than a simple disclaimer of "affiliation" is necessary. Id. (emphasis added). Here, Sturm's "use" statement does nothing to explain the relationship between Keurig and Sturm's product. And Sturm's hidden disclaimer is vague and does not, for example, explain that Sturm's product is not endorsed by or licensed by Keurig as evidenced by the confusion Ms. Moncey and Ms. Buck exhibited when purchasing the Sturm cartridges.

procedures allowing otherwise inadmissible evidence should be applied. Sturm cites to no case

that holds hearsay is inadmissible in the context of a motion for preliminary injunction.

### C.  THE COURT CAN CONSIDER INTERNET POSTINGS

Courts have admitted into evidence Internet postings like Keurig's evidence of actual

confusion and frustration with the defective Sturm cartridges.[22] As one district court noted when

admitting into evidence Internet postings evidencing actual confusion:

> Evidence of actual confusion by consumers is strong evidence of likelihood of
> confusion. VW has submitted several Internet articles and blogs, which suggest
> that consumers believe the Verdier vehicle is a VW product. For example, one
> posting states that '[i]f you are looking for eco-friendly vehicles around, check
> out this one by Volkswagen. We all love the outdoors and roughing it. So if you
> want to add a piece of green to your ex-tra curricular activities, check out this
> creation by Canadian Alexandre Verdier.' This factor, therefore, weighs in favor
> of a finding of actual confusion.

Volkswagen AG v. Verdier Microbus and Camper, Inc., No.C 09-00231 JSW, 2009 WL 928130

at *4 (N.D. Cal. April 3, 2009) (internal citations omitted).

Indeed, this Court, just a few months ago, in QVC, Inc. v. Your Vitamins, Inc., noted that

the admissibility of Internet postings was an issue of first impression for the Court. 714 F. Supp.

2d 291 (D. Del. 2010). The Court did not rule on the issue, but noted:

> The court need not definitively determine, therefore, whether blog posts should be
> deemed relevant and credible evidence (generally and, in this context, as evidence
> of consumer confusion) – an issue of first impression for this court. Blog posts
> such as those in this case may be more reliable than broad-based surveys, insofar
> as they represent direct feedback from consumers specifically interested in the
> product(s) at issue, although concerns regarding such posts' authenticity are not
> ill-founded. Courts have reached differing conclusions on the issue.

Here, because the context is a motion for preliminary injunction where evidentiary

standards are relaxed, such evidence should be admitted. "The purpose of a preliminary

injunction is merely to preserve the relative positions of the parties until a trial on the merits can

---

[22] See First Loughran Decl., D.I. 36, ¶¶ 2-11, Exs. A-E.

be held.  Given this limited purpose, and given the haste that is often necessary if those positions

are to be preserved, a preliminary injunction is customarily granted on the basis of procedures

that are less formal and evidence that is less complete than in a trial on the merits." University of

Texas v. Camenisch, 451 U.S. 390, 395 (1981); see also  Kos Pharmaceuticals, 369 F.3d at 718

(3d Cir.) ("It is well established that a preliminary injunction is customarily granted on the basis

of procedures that are less formal and evidence that is less complete than in a trial on the

merits.") (internal quotations and citations omitted); Sierra Club, 992 F.2d at 551 ("[a]t the

preliminary injunction stage, the procedures in the district court are less formal, and **the district**

**court may rely on otherwise inadmissible evidence**") (emphasis added); Flynt Distributing,

734 F.2d at 1394 ("The urgency of obtaining a preliminary injunction necessitates a prompt

determination . . . The trial court may give even inadmissible evidence some weight, when to do

so serves the purpose of preventing irreparable harm before trial."").  Keurig's motion for

preliminary injunction is exactly the kind of urgent filing in which these "less formal"

procedures allowing otherwise inadmissible evidence should be applied.

## II. THE EXPEDITED NATURE OF KEURIG'S ORIGINAL FILING PRECLUDED EXTENSIVE TESTING, BUT STURM'S MISLEADING TEST RESULTS INDICATE A NEED FOR CONSIDERATION OF KEURIG'S INDEPENDENT TEST LAB RESULTS

Keurig's need to move expeditiously with its motion for a preliminary injunction

precluded extensive testing of the Sturm cartridges at that time.  Keurig did not even have access

to samples of Sturm's cartridges until early October, as Sturm had refused to provide any and

they were not publicly available as far as Keurig could tell.  Keurig's expedited testing of 30

Sturm cartridges in the days following the "early October" national release of the Sturm

cartridges indicated they were dangerously defective and could cause serious damage to Keurig's

reputation if consumers associated Sturm's cartridges with Keurig.[23]  To prevent that irreparable

harm, Keurig moved quickly to file its motion for a preliminary injunction.

After Keurig filed its opening brief, Sturm indicated, during a teleconference with the

Court on October 26, 2010, that it would provide the Court with test data it had accumulated on

its cartridges.  Keurig attempted to work with Sturm to obtain that data, but Sturm refused.[24]

Because Keurig was concerned that Sturm's refusal to disclose its data indicated that it might

manipulate that data and "cherry pick" results that would support its position (and ignore those

that did not), Keurig commissioned a more extensive set of testing of Sturm's cartridges by an

independent engineering laboratory.[25]  As Keurig suspected, Sturm did in fact manipulate its test

results.  Sturm misleadingly claimed that it saw "no failures" of its cartridges.[26]  In fact, Sturm's

testers removed, from the testing protocol, a cartridge that they noticed to be defective.[27]  This

gaming of the test calls into question the credibility of all of Sturm's test results and calls for

reliable, independent test results, like those detailed in the Soto Declaration, that the Court can

consider in its analysis.[28]

In addition, Keurig's independent test results and the Sullivan Reply Declaration address

new issues raised for the first time in Sturm's response.  For example, Sturm argued that its

---

[23] See Keurig's Opening Brief, D.I. 11, 4-5, 17-18; Sullivan Opening Decl., D.I. 14, ¶¶ 2-22.

[24] See Second Hrycyszyn Decl., submitted with this responsive brief, ¶¶ 4-6, Ex. B.

[25] See Declaration of Orlando Soto in Support of Keurig's Motion for Preliminary Injunction ("Soto Decl.), D.I. 37.  Realizing that time was short and that conducting a more extensive test of Sturm and Keurig cartridges would take considerable time, Keurig initiated the independent tests immediately after Sturm refused to share its existing test data.  That is why the protocol for this independent testing was finalized before Sturm filed its responsive brief.

[26] Sturm's Answering Brief in Opposition to Keurig's Motion for Preliminary Injunction, ("Sturm's Responsive Brief"), D.I. 24, 4.

[27] See Declaration of Matthew Hubert in Support of Sturm's Opposition, D.I. 30, ¶ 18.

[28] See Soto Decl., D.I. 37;  Declaration of Kevin Sullivan in Support of Keurig's Reply in Support of Its Motion for Preliminary Injunction ("Sullivan Reply Decl."), D.I. 38.

cartridges are "virtually the same" as Keurig's and that "purchasers and consumers of the Keurig
K-Cups would experience similar failures when using the Keurig K-Cups with Keurig brewing
machines" as they do using the Sturm knock-offs in Keurig brewing machines.  Keurig is entitled
to respond to these new issues in its reply brief.[29]

The results of the independent testing and the issues addressed by the Sullivan Reply
Declaration are, therefore, important unbiased test results and information that the Court should
consider in determining whether the Sturm cartridges are usable to safely and effectively brew a
cup of coffee in a Keurig brewer as advertised.

### A.    THE ADDITIONAL TEST RESULTS  AND SULLIVAN DECLARATION ARE RESPONSIVE TO NEW ISSUES RAISED IN  STURM'S RESPONSE

The Sullivan Declaration and the independent test results detailed in the Soto Declaration
also address issues raised for the first time in Sturm's opposition to Keurig's motion for
preliminary injunction, and, therefore, are proper and should not be stricken.  Keurig is entitled
to respond to these new issues in its reply brief.[30]

In its response, Sturm argues that (1) the "Sturm coffee cartridge is virtually the same as
the Keurig K-Cup,"[31] (2) Sturm's eight years of experience in manufacturing its "Sugar Free
Drink Mix" is evidence of its ability to manufacture cartridges that are suitable for use in

---

[29] See Grantz v. State Farm Mutual Auto. Ins., No. SACV 08-0855 AG, 2009 WL 2870158, at *4
(C.D. Cal. Sept. 2, 2009) (denying  plaintiff's motion to strike evidence from defendant's reply
where arguments raised in reply brief directly addressed issues raised in plaintiff's reply – "After
reviewing the briefing and the proffered evidence, the Court finds that the evidence properly
responds to issues raised in Plaintiff's Opposition.");  First Specialty Ins. Corp. v. 633 Partners,
Ltd., 300 Fed. Appx. 777, 788 (11th Cir. 2008) (affirming district court's denial of a request for
surreply based on determination that party opposing surreply had not submitted "new" evidence
in its reply, but merely responded to arguments raised in the opposition brief).

[30] See supra note 29.

[31] Beringause Decl., D.I. 27, ¶ 6.

Keurig's brewers,[32] and (3) "purchasers and consumers of the Keurig K-Cups would experience

similar failures when using the Keurig K-Cups with Keurig brewing machines" as they do using

the Sturm knock-offs in Keurig brewing machines.[33]  The Sullivan and Soto Declarations explain

why each of these assertions is incorrect.[34]

Sturm's cartridge may **appear** to be "virtually the same as the Keurig K-Cup," as

Sturm's President and CEO admits.[35]  Indeed, it is the virtually identical **appearance** of Sturm's

cartridges and its packaging that is causing, in part, and is likely to continue causing consumer

confusion regarding the source of Sturm's cartridges.

Setting misleadingly similar appearances aside, however, the Sturm cartridge is not

**functionally** the same as the Keurig cartridge.  Indeed, the Sturm cartridge is not usable to safely

and effectively brew a cup of coffee in a Keurig brewer.  The Sullivan declaration explains why

the Sturm and Keurig cartridges are not "virtually the same" from a functional perspective.  The

Sullivan Declaration explains the highly-engineered design of the Keurig cartridges, the stringent

demands placed on the cartridges when they are used in Keurig brewers, and the failures that can

---

[32] Declaration of Douglas S. Molden in Support of Sturm's Opposition, D.I. 29, ¶¶ 4, 19; see also Sturm's Responsive Brief, D.I. 24, 3-4; Declaration of Robert A. Spreeman in Support of Sturm's Opposition, D.I. 25, ¶¶ 2-3.

[33] Declaration of Fred Willard in Support of Sturm's Opposition ("Willard Decl."), D.I. 26, ¶ 22.

[34] Throughout the course of seeking this preliminary injunction, Keurig has taken the position that the statement Sturm makes on its packaging – that its cartridges are "for use by" Keurig customers – is literally untrue because, by necessary implication, a customer reading this statement would believe that use of a Sturm cartridge with his Keurig brewer would effectively brew a cup of coffee.  Keurig has made this exact point consistently in its argument, pointing out that this phrase meant that a cartridge would work normally with (that is, be consistently and functionally suitable with) a Keurig machine.  Keurig's customers have provided evidence of being so misled.  See Moncey Decl., D.I. 34, ¶¶ 3-5 (explaining that she purchased the Sturm cartridge because she read that they were "for use by owners of Keurig® coffee makers but that the failures of Sturm cartridges with her Keurig machine were "the problem.").

[35] Beringause Decl., D.I. 27, ¶ 6.

manifest when improperly designed cartridges, like Sturm's, are used in Keurig brewers.[36]

The Soto Declaration presents independent test results that confirm that the Sturm and Keurig cartridges are not "virtually the same" and do not fail at the same rate as asserted by Sturm.[37]  Testing of 360 Keurig cartridges demonstrated a **zero** failure rate: they had no failures of any kind.  By contrast, the Sturm cartridges exhibited 228 failures out of 2,000 tested cartridges (an 11.4% failure rate).  The dangers presented by these cartridges range from spraying scalding water onto consumers, to serving them beverages containing shards of plastic, to clogging their brewers and making them reach inside to pull stuck cartridges off a sharp needle.  These results clearly establish that the Sturm and Keurig cartridges do not fail at the same rate and that they are not functionally the same.

The Sullivan Declaration also explains why Sturm's eight years of experience in manufacturing its "Sugar Free Drink Mix" is not applicable to the design of a cartridge intended for use in a Keurig brewer.[38]  Sturm's "Sugar Free Drink Mix" packages are designed to have the foil lids peeled back by consumers and the contents dumped by hand into a cup of water.[39] Sturm's "Sugar Free Drink Mix" cartridges are not designed to have pressurized $180\,^{\circ}F - 198\,^{\circ}F$ hot water forced through holes pierced in the top and bottom of the cartridges.  If Sturm's cartridges are designed and manufactured like its Sugar Free Drink Mix, it could be a reason for the high failure rate seen in Sturm's cartridges.

Because the Sturm cartridges are not functionally the same as Keurig's cartridges, and indeed are defective, they fail when used in Keurig's brewers.  Moreover, Keurig cartridges and

---

[36] See Sullivan Reply Decl., D.I. 38, ¶¶ 2-10, 14-20.

[37] See Soto Decl., D.I. 37, ¶ 19; see also id. at ¶¶ 2-18, Exs. 2-3; Sullivan Decl., D.I. 38, ¶¶ 11-13.

[38] See Sullivan Reply Decl., D.I. 38, ¶¶ 21; see also id. at ¶¶ 2-10, 14-20.

[39] See Sullivan Reply Decl., D.I. 38, ¶ 21.

Sturm cartridges do not fail at the same rates as suggested by Sturm's expert.[40]  The Sullivan and

Soto Declarations respond to these new issues raised in Sturm's response, and, therefore, the

Court should not strike these declarations or the portions of Keurig's reply brief that rely on

these declarations.

**B.    TO THE EXTENT THE COURT CONSIDERS THE ADDITIONAL TEST RESULTS AND SULLIVAN DECLARATION TO BE NEW EVIDENCE, THE COURT SHOULD NOT STRIKE THIS INFORMATION, BUT ADMIT STURM'S SURREPLY INSTEAD**

To the extent that the Court finds that the Sullivan and Soto Declarations are not

responsive to new issues raised in Sturm's response, the Court should still consider this

important evidence.  Instead of striking this information, the Court may simply admit the

surreply that Sturm has already submitted to this court.

As discussed above, standards are relaxed during motions for a preliminary injunction

such as this one.  See, e.g., University of Texas, 451 U.S. at 395; see also Kos Pharmaceuticals,

369 F.3d at 718; Sierra Club, 992 F.2d at 551 ("At the preliminary injunction stage, the

procedures in the district court are less formal, and **the district court may rely on otherwise**

**inadmissible evidence**") (emphasis added); Flynt Distributing, 734 F.2d at 1394.

Courts routinely favor a surreply in circumstances like this, especially in the context of

preliminary injunction.  See, e.g., Pimentel, 229 F.R.D. at 210-11; Hockett, 489 F. Supp. 2d at

35 ("The Court is loathe to strike a brief, especially when the better course is to grant the request

for leave to file a surreply, so that a complete record may be considered.").[41]  Any prejudice to

Sturm from introduction of this highly relevant information in Keurig's reply has been cured by

Sturm's surreply.

---

[40] See Willard Decl., D.I. 26., ¶ 22

[41] See supra note 6.

C.   **THE SOTO DECLARATION PROVIDES RELIABLE INDEPENDENT TESTING
EVIDENCING THE DEFECTS EXHIBITED BY STURM'S CARTRIDGES**

Sturm seeks to strike the Soto Declaration on the grounds that it is "neither objective nor

reliable."[42]   Sturm argues the test data is unreliable because a number of Sturm's cartridges failed

in Keurig's commercial B2003 brewer.  Although Keurig's B2003 brewer is no longer in

production, Keurig sold about **70,000** of the B2003 brewers, and it remains one of the more

widely used Keurig brewers in offices today.  In addition, the B2003 is a large office brewer that

consumes many more cartridges on a daily basis than a home brewer.[43]  Therefore, it is highly

likely that a disproportionate share of Sturm's cartridges will be used in Keurig's B2003 brewer.

Moreover, Sturm cartridges have no disclaimer, that Keurig could find, indicating that they are

not compatible with certain Keurig brewers, like the B2003.  Indeed, Sturm's packaging broadly

states "for use by owners of Keurig® coffee makers" with no qualifications whatsoever.

Therefore, it is appropriate to determine the compatibility of the Sturm cartridge with Keurig's

B2003 brewer.[44]

Sturm also argues that the test data is unreliable because certain information was

allegedly "withheld," in particular: (1) the distribution of Sturm cartridge failures amongst the

test brewers; (2) the brewers used to test the Keurig cartridges; (3) when the Keurig cartridges

were tested; and (4) where the cartridges were obtained.[45]  However, the Soto Declaration

discloses much of this allegedly "withheld" information and the remainder is not relevant.  With

respect to (1), the Soto Declaration (D.I. 37) provides a detailed table, Exhibit 2, identifying

---

[42] See Sturm's Motion to Strike, D.I. 43, 4.

[43] See Sullivan Reply Decl., D.I. 38, ¶13.

[44] That the Sturm cartridges failed at a higher rate in the Keurig B2003 brewer does not indicate
that the test is unreliable, only that the B2003 brewer is a more demanding commercial brewer.

[45] See Sturm's Motion to Strike at 5.

exactly what failures of the Sturm cartridges occurred in which Keurig brewers.[46]  With respect

to (2), the Soto Declaration also clearly states that the 360 Keurig cartridges were tested, 60 in

each of the 6 different types of Keurig test brewers – the B131, B60, B150/155, B200, B2003,

and B3000 brewers.[47]  With respect to (3), it is not clear why the date of the Keurig cartridge

testing is relevant, however, the test was conducted between November 2nd (since Mr. Soto

stated in his declaration that he used that November 2nd protocol to test the Keurig cartridges)

and November 16th (the date Mr. Soto signed his declaration detailing the test results).[48]  With

respect to (4), it is not clear why the source of the Sturm cartridges is relevant.  Though not

specifically stated in Mr. Soto's declaration, the cartridges were obtained from Price Chopper

and Walmart stores in Massachusetts.  There was no "selection" process.  Over 150 boxes of

---

[46] With respect to testing for particulate matter generated by the cartridges, Mr. Soto explains "I tested for foreign matter by pouring the cup of coffee made using a Sturm "Grove Square" beverage cartridge through a strainer and examining whether any foreign matter was retained by the strainer or left in the cup. I saved any foreign matter I detected with the Sturm "Grove Square" beverage cartridge that exhibited the failure. I ensured that the coffee cup and strainer were free of foreign matter before I ran each subsequent test." Soto Decl., D.I., 37, ¶ 10.

[47] See Soto Decl., D.I. 37, ¶ 19 ("I also tested 360 genuine Keurig cartridges using the same protocol detailed in Exhibit 2.").  As detailed in pages 5-7 of the test protocol, Mr. Soto tested 60 cartridges in each of the six different types of Keurig brewers.  See id., Ex. 2 at 4 ("Parts A though F will be completed once . . . using Keurig-approved cups"); see also id., Ex. 2 at 5-7.

Mr. Soto tested 2,000 Sturm cartridges in order to match the number of Keurig cartridges normally tested during qualification of a new beverage product packaged in cartridge cups and lids made by a Keurig-qualified vendor using Keurig-qualified materials.  See Sullivan Opening Decl., D.I., 14, ¶ 3.  Per the protocol, Mr. Soto tested 60 cartridges in each of the six different types of Keurig brewers per test cycle.  However, because two of each of the B131, B60, B150/155, B200, and B3000 brewers were used in the testing, 30 cartridges were tested in each of those individual brewers per test cycle, whereas 60 cartridges were tested in the single B2003 brewer used in the testing.  A total of 360 Sturm cartridges were tested per test cycle (60 cartridges tested in each of six different brewer types).  See Soto Decl., D.I. 37, ¶ 5, Ex. 2 at 4-7.  1,800 Sturm cartridges were tested in 5 such test cycles (5 cycles of 360 cartridges each), and the remaining 200 Sturm cartridges were tested about evenly amongst the 6 different types of brewers to reach the 2,000 cartridge test goal.

[48] See Soto Decl., D.I. 37, ¶ 19 ("I also tested 360 genuine Keurig cartridges using the same protocol detailed in Exhibit 2."; id. at Ex. 2.

Sturm cartridges were required for the testing.  What was available in local Price Chopper and Walmart stores was used in the testing.

Lastly, Sturm's attempts to minimize the harm caused by confusion falls flat.  Sturm attempts to justify its failure rate by pointing to a few isolated incidents of consumer complaints about Keurig's cartridges.  However, Sturm misses the point.  It is the association of Keurig with Sturm's products and its failures, that is the problem.  Moreover,  Keurig has sold over 7.5 **billion** cartridges.  The handful of complaints that Sturm identifies are an infinitesimal fraction of that figure (about one in 220,600,000, i.e., 0.00000045%).

Accordingly, the independent test results detailed in the Soto Declaration are reliable and should not be struck.

## III.   THE ACTUAL STURM PACKAGING PROVIDED WITH KEURIG'S REPLY IS NOT CUMULATIVE

Sturm further seeks to strike as "cumulative" the sample of an actual Sturm cartridge package submitted with Keurig's reply brief.[49]  However, no other sample of an actual cartridge package has been submitted to the Court.  Only photocopies of various portions of that Sturm packaging have been submitted.  The actual sample will allow the Court to view the Sturm cartridge package in its true three-dimensional shape as it would appear to consumers on a retail shelf.  That exhibit is, therefore, not cumulative and should not be stricken from the record.[50]

## IV.   STURM'S REQUEST FOR ORAL ARGUMENT

Sturm requested oral argument (D.I. 45) on the issues raised in Keurig's motion for preliminary injunction (D.I. 11).  Keurig is not opposed to the Court scheduling oral argument on those issues.  However, Keurig believes the Court can decide the motion on the papers.

---

[49] See Sturm's Motion to Strike, D.I. 43, n. 9; see also First Loughran Decl., D.I. 36, ¶ 13, Ex. I.

[50] It is not clear what Sturm is trying to hide by striking from the record a sample of its own packaging.  Certainly, Sturm cannot claim surprise at seeing its own packaging.

## V. SUMMARY

For the reasons detailed above, the Court should decline to strike any portion of the Moncey, Buck, Soto, Loughran, or Sullivan Declaration, or the portions of Keurig's reply that relies on that evidence. If any relief is required, the Court should simply grant Sturm's request to file the surreply that it has already submitted to the Court (D.I. 42).


Dated: December 10, 2010                    YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                            /s/ Karen E. Keller
                                            John W. Shaw (No. 3362)
                                            jshaw@ycst.com
                                            Karen E. Keller (No. 4489)
                                            kkeller@ycst.com
                                            The Brandywine Building
                                            1000 West Street, 17th Floor
                                            Wilmington, DE 19801
                                            (302) 571-6600

OF COUNSEL:
Michael A. Albert
malbert@wolfgreenfield.com
Gerald B. Hrycyszyn
ghrycyszyn@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

                                            Attorneys for Plaintiff Keurig, Incorporated

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on December 10, 2010, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Richard L. Horwitz, Esquire [*rhorwitz@potteranderson.com*]
David E. Moore, Esquire [*dmoore@potteranderson.com*]
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801

Additionally, I hereby certify that on December 10, 2010, copies of the foregoing document were served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated below:

### BY E-MAIL

Craig S. Fochler, Esquire [*cfochler@foley.com*]
Foley & Lardner LLP
321 N. Clark Street
Suite 2800
Chicago, IL  69654-5313

Allen A. Arntsen, Esquire [*aarntsen@foley.com*]
Foley & Lardner LLP
Verex Plazsa
150 East Gilman Street
Madison, WI  53703

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
Karen E. Keller (No. 4489) [*kkeller@ycst.com*]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302)-571-6600

*Attorneys for Plaintiff Keurig, Incorporated*