IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-841-SLR |
| | ) |
| STRUM FOODS, INC., | ) |
| | ) |
| Defendant. | ) |

John W. Shaw, Esquire, and Karen E. Keller, Esquire, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Michael A. Albert, Esquire, and Gerald B. Hrycyszyn, Esquire, of Wolf, Greenfield & Sacks, P.C., Boston, Massachusetts.

Richard L. Horwitz, Esquire, and David E. Moore, Esquire, of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Craig S. Fochler, Esquire, Foley & Lardner LLP, Chicago, Illinois. Allen A. Arntsen, Esquire, Foley & Lardner LLP, Madison, Wisconsin

**MEMORANDUM OPINION**

Dated: March 1⁰, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Keurig, Inc. ("plaintiff") filed this action against Sturm Foods, Inc. ("defendant"), on October 1, 2010. (D.I. 1) Plaintiff manufactures a popular line of single-serve coffee machines under the "Keurig" brand name, along with the corresponding coffee filled cartridges for use in said machines. (D.I. 11 at 1-2) Defendant manufactures and sells coffee filled cartridges for use in plaintiff's machines under the "Grove Square" brand name. (D.I. 23 at 3) In its amended complaint, plaintiff alleges that defendant improperly uses its "Keurig" trademark on defendant's products' packaging in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, and that said packaging contained false and misleading statements, infringes plaintiff's trade dress, and unfairly competes and falsely designates its origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Delaware Deceptive Trade Practices Act ("DTPA"), 6 Del. C. § 2531 (2009). (D.I. 8) In addition to the § 43(a) claims, plaintiff alleges that defendant's use of its mark causes dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). (*Id.*) Plaintiff also claims that defendant's products infringe U.S. Patent Numbers 7,165,448 and 6,606,938, and unfairly compete under the Delaware common law. (*Id.*) Currently pending before the court is plaintiff's motion for a preliminary injunction based on its trademark and false advertising claims, and defendant's partial motion to dismiss for failure to state a claim. (D.I. 9; D.I. 42) The court held a hearing addressing plaintiff's motion on February 18, 2011. For the following reasons, the court denies both motions.

## II. BACKGROUND

## A. Single-Serve Coffee Brewers

Single-serve coffee brewing systems allow users to enjoy freshly brewed coffee one cup at a time while eliminating the inconvenience of grinding beans, measuring coffee, and handling messy filters. (D.I. 11 at 1) These systems generally rely on pre-packaged servings of coffee in individual serving sizes that integrate the ground coffee bean and filter into a single unit. (*Id.* at 2) In plaintiff's products, these cartridges, known as "K-Cups," consist of a sealed container with an internal filter and ground coffee. (*Id.*)

In order to brew a fresh cup of coffee, consumers place a K-Cup in a receptacle at the top of a Keurig brewer and close the lid. (*Id.*) As the lid is closed, needles puncture the top and bottom of the cartridge. (*Id.*) The user then selects their desired brewing parameters and, within minutes, hot water is forced into the cartridge from the top needle, through the coffee and filter, and exits the bottom needle into the user's cup. (*Id.*)

## B. The Parties and Contested Product Packaging

Plaintiff owns and manufactures the Keurig® brand single-serve coffee machines, and licenses and manufacturers K-Cup® coffee cartridges for use in said machines. (D.I. 13, Wood Decl. ¶ 2) Plaintiff owns the trademarks for the federally registered Keurig® and K-Cup® brand names. (D.I. 12, Hrycyszyn Decl. at ¶ 2) Defendant manufactures and markets Keurig compatible coffee cartridges under the Grove Square® brand name that were first introduced in late 2010. (D.I. 27, Beringause Decl. at ¶ 8)

In August of 2010, defendant began selling its products in major retail stores including Big Lots and Wal-Mart. (*Id.*) Defendant's use of plaintiff's mark appears in two places. First, the product's package contains small text on the bottom left hand corner of the front of the package that reads "*For use by owners of Keurig® coffee makers." (*Id.* at 9; D.I. 13, Wood Decl. at 2) Second, on the bottom of the package, a disclaimer to the left of the directions reads "*Sturm Foods, Inc. has no affiliation with Keurig, Incorporated." (D.I. 13, Wood Decl. at 5)

The rest of the packaging makes no reference to the Keurig or K-Cup trademark. Relevant to the case at bar, the packaging contains images of two Grove Square cartridges grouped together, one laying on its side to better illustrate its top, and one vertically oriented, surrounded by coffee beans. (*Id.* at 2-4, 7) In addition, the package contains a sliding bar graph indicating whether the coffee inside is a light, medium or dark roast. (*Id.*) The front of the box also contains a v-shaped perforated opening that ends in a U shaped tab. (*Id.* at 2)




The top and back of the box contain short stories that are seemingly intended to

evoke a romantic association with drinking coffee. The top (or side, depending on the

size of the packaging) reads as follows:

Great Coffee. Plain and Simple

For Generations, Americans have appreciated a great cup of coffee. Long
before it became complicated and grandiose, we savored it in neighborhood
coffee shops and diners where the atmosphere was friendly, and the coffee
was simply fresh, hot, and delicious. Grove Square coffee recaptures this
rich, traditional cup, and brings it home with single-serve convenience. Our
lives might be more complicated now, but our coffee doesn't have to be.
Grove Square coffee. It's one cup of coffee you'll feel right at home with,
and it's right here in your neighborhood.

(D.I. 13, Wood Decl. at 5) The back of the packaging has a "quality promise" that

states "Grove Square coffee is made with some of the world's highest quality Arabica

beans, roasted and ground to ensure peak flavor, then packaged to lock in optimum

freshness." (Id. at 3)

## III. STANDARD OF REVIEW

### A. Preliminary Injunction

Traditional rules of equity apply to requests for injunctive relief. *See eBay, Inc. v.*

*MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). "The decision to grant or deny . . .

injunctive relief is an act of equitable discretion by the district court." *Id.* The grant of a

preliminary injunction is considered an "extraordinary remedy" that should be granted

only in "limited circumstances." *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700,

708 (3d Cir. 2004) (citation omitted).

The moving party for injunctive relief must establish: "(1) a likelihood of success

on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that

4

granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Id.* (citation omitted). The burden lies with the movant to establish every element in its favor or the grant of a preliminary injunction is inappropriate. *See P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005). If either or both of the fundamental requirements – likelihood of success on the merits and probability of irreparable harm if relief is not granted – are absent, an injunction cannot issue. *See McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994).

### B. Motion to Dismiss for Failure to State a Claim

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to

5

raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* at 1959. "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

"In reviewing a motion to dismiss, '[c]ourts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.'" *Collins & Aikman Corp. v. Stockman*, Civ. No. 07-265-SLR-LPS, 2010 WL 184074 at \*3 (D. Del. Jan. 19, 2010) (*quoting Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "Certain additional materials may also be considered without converting a motion to dismiss into a motion for summary judgment (which generally cannot be ruled upon without providing a plaintiff a reasonable opportunity for discovery)." *Id.* "For instance, 'a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss **if the plaintiff's claims are based on the document**. . . .'" *Id.* (emphasis added) (citations omitted). As the Third Circuit has explained:

> The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond. When a **complaint relies on a document**, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.

*Pension Benefit*, 998 F.2d at 1196-97 (emphasis added). "The facts necessary to establish an affirmative defense must generally come from matters outside of the complaint. Thus, with some exceptions, affirmative defenses should be raised in

responsive pleadings, not in pre-answer motions brought under Rule 12(b)." *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657 (3d Cir. 2003) (citations omitted).

## IV. DISCUSSION

### A. Preliminary Injunction

Plaintiff argues that it is entitled to a preliminary injunction based on its trademark infringement claims, its trade dress infringement claims, and its false advertizing/unfair competition claims. (D.I. 9) For the reasons discussed below, plaintiff fails to show a likelihood of success on the merits for any of these claims. Therefore, plaintiff's motion is denied.

#### 1. Trademark infringement

##### a. Standard

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994); *Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005).

A plaintiff proves trademark infringement by demonstrating that: (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3) the defendant's use of its mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270, 279 (3d Cir. 2001); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000); *Fisons*, 30 F.3d at 472.

7

Likelihood of confusion exists when consumers viewing a mark would probably

assume that the product or service it represents is associated with the source of a

different product or service identified by a similar mark. *Checkpoint*, 269 F.3d at 280;

*Victoria's Secret*, 237 F.3d at 211; *Fisons*, F.3d at 472.

The Third Circuit has adopted a ten-factor test, known as the "*Lapp* test," to

determine likelihood of confusion in the market. These factors are:

> (1) the degree of similarity between the owner's mark and the alleged
> infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and
> attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of
> actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, competing or not competing, are marketed through
> the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of the consumers, whether
> because of the near-identity of the products, the similarity of function, or
> other factors; and
> (10) other facts suggesting that the consuming public might expect the prior
> owner to manufacture a product in the defendant's market, or expect a prior
> owner is likely to expand into the defendant's market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983); *Sabinsa Corp v.*

*Creative Compounds, LLC*, 609 F.3d 175, 183 (3d. Cir. 2010).

No single *Lapp* factor is determinative in a likelihood of confusion analysis, and

each factor must be weighed and balanced against the others. *Kos. Pharms.*, 369 F.3d

at 709; *Checkpoint*, 269 F.3d at 280. The Third Circuit does not discount the strength

of one factor because of the weakness of another factor. *Fisons*, 30 F.3d at 476. "Not

all of the [*Lapp*] factors are present in every case." *Id.* at 476 n.11. However, if a court

finds certain *Lapp* factors to be inapplicable or unhelpful in a particular case, the court should explain its choice not to employ those factors. *Kos Pharms.*, 369 F.3d at 711.

When a case involves the affirmative defense of nominative fair use, the Third Circuit has established a burden shifting framework. "The plaintiff must first prove that confusion is likely due to the defendant's use of plaintiff's mark." *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 222 (3d Cir. 2005). "Once plaintiff has met its burden of proving that confusion is likely, the burden then shifts to defendant to show that its nominative use of plaintiff's mark is nonetheless fair." *Id.* This involves a three prong test, derived in part from the Ninth Circuit's test. Under the Third Circuit's test, a defendant must show:

> (1) that the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service; (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product; and (3) that the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services.

(*Id.*)

Because "the Lanham Act does not require that [the *Lapp* factors] be followed precisely so long as the relevant comparisons suggested by the test are made," the Third Circuit has determined that the first two *Lapp* factors are not useful in nominative fair use cases. *Id.* at 224-225.

### b. *Lapp* factors

In the case at bar, there is no dispute that plaintiff owns the Keurig trademark and that it is distinctive. However, as the Third Circuit has said, these factors are not

relevant to a nominative fair use analysis.[1] *Century 21 Real Estate Corp.*, 425 F.3d at 224-225. Similarly, the fact that the goods are marketed through the same sales channels is irrelevant to the likelihood of confusion analysis "because [defendant] is not attempting to use [plaintiff's] marks to refer to [its] own [products], but rather using the marks to refer to [defendant's products]. *Id.* at 225. Plaintiff also argues that the length of time the defendant has used the mark without evidence of actual confusion and evidence of actual confusion are not relevant in this case. (D.I. 11 at 12) Defendant reluctantly agrees. (D.I. 24 at 7) Consequently, only *Lapp* factors 3, 5, and 8-10 are relevant to the court's likelihood of confusion analysis.

### (1) The price of goods

The price of goods is low, even when bought in bulk packaging. Each single serving cartridge costs approximately $0.50, and can be purchased in bundles for under $15.[2] This factor favors plaintiff. *Versa Prods. Co. Inc. v. Bifold Co.*, 50 F.3d 189, 204 (3d Cir. 1995).

### (2) The intent of the defendant in adopting the mark

---

[1] During oral argument, plaintiff's lawyer repeatedly cited the first *Lapp* factor, arguing that a likelihood of confusion is inevitable because of defendant's use of an identical mark. (D.I. 57 at 12:3-10, 57:9-15) Plaintiff relied on a Third Circuit opinion from 1990 in support of its argument, despite the existence of a 2005 opinion, specifically on the applicability of the *Lapp* factors to nominative fair use, wherein the Third Circuit **expressly and unambiguously states that the first *Lapp* factor is inapplicable** in cases involving a nominative fair use defense. *Century 21 Real Estate Corp.*, 425 F.3d at 224-225.

[2] Amazon.com, http://www.amazon.com/Grove-Square-Coffee-12-Count-Brewers/dp/B004H3SI2S/ref= sr_1_2?ie=UTF8&qid=1298495453&sr=8-2 (last visited Feb. 23, 2011).

Defendant's intent in using the mark was "to inform potential customers of the compatibility of Strum's coffee cartridges with Keurig brewing machines." (D.I. 27, Beringause Decl. at ¶ 9) Defendant further included a disclaimer on the bottom of the box near the directions and expiration date that explains that defendant has no affiliation with Keurig.[3] *Id.* Defendant used the smallest amount of the mark possible. It printed the mark in plain text without the accompanying color pattern, font, or stylized background indicative of plaintiff's normal use of the mark. Given this minimalist use, coupled with a disclaimer on the bottom, this factor strongly favors defendant's use of the mark.

### (3) The extent to which the targets of the parties' sales efforts are the same

"When the parties target their sales efforts to the same group of consumers there is a greater likelihood of confusion between the two marks." *Sabinsa Corp, LLC*, 609 F.3d at 188. However, "[i]n a nominative use case, the mere fact that the parties target identical customers has no bearing. But to the extent the targeted customers differ, that lessens the likelihood of confusion." *Century 21 Real Estate Corp.*, 425 F.3d at 249. Because defendant has proffered no evidence that its target customers differ, this factor is neutral.

---

[3] Defendant's use of the mark and accompanying disclaimer in this case is substantially different from the case that plaintiff relies on for the proposition that use of a disclaimer does not rectify consumer confusion: *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532 (D.N.J. 2008). In *Chanel*, defendants were selling counterfeit versions of Chanel products bearing the exact same mark as plaintiff in every way, shape and form. *Id.* at 534. The court found that a disclaimer at the bottom of a web page was not enough to show that defendant was not attempting to trade on plaintiff's goodwill. *Id.* at 538.

### (4) The relationship of the goods in the minds of the customers

The goods in question are cartridges meant for use in Keurig single serve coffee brewing systems. Keurig's own website shows 241 different flavors of K-Cups with dozens of different brand names.[4] Given the fact that customers are encouraged to try different K-Cups from this wide variety, there is no reason to assume that customers would associate the poor taste or poor function of a single brand of K-Cup with the Keurig system instead of with the K-Cup's brand itself. Plaintiff's own customer testimonials show that customers are willing to switch from one brand of K-Cup to another if the brand does not meet their performance or taste criteria. (D.I. 33 at 3) Even if some customers were initially confused as to whether Grove Square coffee is authorized by plaintiff, it is of little concern to the court because "some possibility of consumer confusion must be compatible with fair use." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121 (2004).

### (5) Other facts suggesting that the consuming public might expect the prior owner to provide both products or expand into the market

Just as with the extent to which the targets of the parties' sales efforts are the same,

> to the extent that the consuming public expects plaintiffs to offer defendant's [products], to offer [products] in the defendant's market, or to expand into the defendant's market, this factor has no bearing. But the less the consuming public would expect such conduct from plaintiffs, the more this factor cuts against a likelihood of confusion.

---

[4] Keurig.com, http://www.keurig.com/shop/k-cups/all-k-cups (last visited Feb. 24, 2011)

*Century 21 Real Estate Corp.*, 425 F.3d at 249. Because defendant and plaintiff necessarily compete in the same market, this factor is neutral.

### b. Nominative fair use

Even had plaintiff shown a likelihood of success on the merits for its initial burden of proving trademark infringement, defendant would, in turn, be likely to succeed in its fair use defense. Plaintiff does not contest that defendant satisfies the first and second prongs of the nominative fair use test and, instead, focuses its argument on the third. (D.I. 33 at 2, 5) Plaintiff argues that, unlike the Ninth Circuit test, the Third Circuit requires that courts "must consider "the defendant's failure to state or explain some aspect of the relationship." (D.I. 33 at 5) (emphasis added) (internal quotations omitted).[5] Where a disclaimer exists, the "disclaimer must be considered in determining whether the alleged infringer accurately portrayed the relationship that existed between plaintiff and defendant." *Century 21 Real Estate Corp.*, 425 F.3d at 231.

Here, the disclaimer states that "Strum Foods, Inc. has no affiliation with Keurig, Incorporated." (D.I. 13, Wood Decl. at 5) Although the disclaimer is listed on the bottom of the box, it is directly across from the directions and the best buy date. There is no evidence demonstrating that customers would not look to the bottom of the box to know which setting to use to make their coffee, whereby the customers could easily see

---

[5] The actual quote from the case is: "[O]ur version suggests that we **can** consider the defendant's failure to state or explain some aspect of the relationship." *Century 21 Real Estate Corp.*, 425 F.3d at 231 (emphasis added). The Third Circuit used **can**, and not **must**, when describing a court's ability to look at defendant's failure to state or explain some aspect of the relationship. However, as discussed *infra*, where a disclaimer exists, courts **must** look at the disclaimer.

13

the disclaimer. Furthermore, the disclaimer does not conflate trademark terms. Were the front of the box to say something to the equivalent of "For use in K-Cup compatible coffee systems," yet the disclaimer only mentioned Keurig, there may be a colorable argument as to what message was actually imparted. Here, however, defendant made an association with its product and Keurig coffee makers, then specifically disclaimed affiliation with Keurig.

### c. Conclusion

Plaintiff has not shown a likelihood of success on the merits for its burden of proving a likelihood of consumer confusion under the *Lapp* test as modified for nominative fair use by *Century 21*. The balance of the *Lapp* factors tips in favor of the defendant due to the evidence at bar regarding defendant's intent in adopting the mark coupled with the relationship of the goods in the minds of the consumer. Even had plaintiff shown a likelihood of consumer confusion, it still did not show a likelihood of success over defendant's nominative fair use defense. Therefore, plaintiff's motion for preliminary injunction based on trademark infringement is denied.

### 2. Trade dress infringement

### a. Standard

Section 43(a) of the Lanham Act provides that:

> [A] person who shall . . . use in connection with any goods or services . . .
> any false description or representation, including words or other symbols
> tending falsely to describe or represent the same . . . shall be liable in a civil
> action by any person . . . who believes that he is or is likely to be damaged
> by the use of such false description or representation.

15 U.S.C. § 1125(a). "To establish trade dress infringement under the Lanham Act, a plaintiff must prove that: (1) the allegedly infringing design is non-functional; (2) the

design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil Nutritionals, LLC v. Heartland Sweeteners*, LLC, 511 F.3d 350, 357 (3d Cir. 2007). "This three-part inquiry alone, however, is insufficient when the plaintiff in a trade dress action seeks protection under the Lanham Act for a series or line of products or packaging. '[W]hen protection is sought for an entire line of products, [the Third Circuit's] concern for protecting competition is acute.'" *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 172 (3d. Cir. 2000) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2nd Cir. 1997)). This concern led to the development of the "consistent overall look" standard.

> Because of the broad reach that protection of trade dress for a series or line of products would embrace, [the Third Circuit] will require this more stringent test before the non-functionality/distinctiveness/likelihood of confusion test is applied. A plaintiff, seeking protection for a series or line of products, must first demonstrate that the series or line has a recognizable and consistent overall look. Only after the plaintiff has established the existence of recognizable trade dress for the line or series of products should the trial court determine whether the trade dress is distinctive, whether the trade dress is nonfunctional, and whether the defendant's use of plaintiff's trade dress is likely to cause consumer confusion.

*Rose Art Indus., Inc.*, 235 F.3d at 173.

### b. Discussion

Plaintiff seeks to protect the trade dress for its K-Cup line of products. Specifically, plaintiff alleges that defendant copied the image of several K-Cups with at least one lying it its side, and plaintiff's motif of spilled coffee beans around the cartridges.[6] (D.I. 11 at 6-7)

---

[6] The court notes that defendant combined these two properties into one image, while these elements are found separately in plaintiff's images.



In addition, plaintiff argues that defendant misappropriates other elements of its trade dress including: (1) an indication of the coffee's roast strength on a graded bar below a caffeination label; (2) a story about the coffee; and (3) perforations for opening the package that forms a tapered v-shape opening ending in a u-shaped tab. (*Id.* at 6-7)

Plaintiff has failed to make a showing that its K-Cup products have a consistency in their overall look. Quite to the contrary, its boxes use a variety of colors and images. Some display a single K-Cup, others, a small group. (D.I. 13, Wood Decl. at 24, 25) Some have the roast strength on a graded bar, and some do not. Some display coffee beans, some do not. (*Id.*) The one consistent trait across the product line is the prominent use of the black and white Keurig trademark. Unlike defendant's use of the mark in a non-stylized, plain text, plaintiff's use is far more elaborate and distinctive.

The mark, as it appears on plaintiff's products, portrays a coffee cup above or to the left of the word Keureg, and the word Keurig in all white block text against a black background.[7] Even then, plaintiff's use of the Keurig mark varies in that it is sometimes a circle, and other times it is a square with "Single Cup" written under it. (D.I. 13, Wood Decl. at 24-28)

Defendant's use of the mark.



Square mark



Circular Mark

Because plaintiff has failed to show that its K-Cup products have a consistency in their overall look, the court need not address the three-part inquiry for trade dress infringement. Plaintiff's motion for preliminary injunction based on trade dress infringement is denied.

### 3. False Advertising under Section 43(a) of the Lanham Act and the DTPA

#### a. Standard

##### (1) Section 43(a) of the Lanham Act

There are two different theories of recovery for false advertising under § 43(a):

"(1) an advertisement may be false on its face; or (2) the advertisement may be literally true, but given the merchandising context, it nevertheless is likely to mislead and

---

[7] The court notes that plaintiff has failed to even argue the non-functional nature of its trade dress and, in association with the v shaped perforated opening, the court doubts it could do so.

confuse consumers." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993). The test for literal falsity is an objective one for the court's determination. "[I]f a defendant's claim is untrue, it must be deemed literally false" regardless of the advertisement's impact on the buying public. *Id.* at 943-44. Further, "only an unambiguous message can be literally false," and "[a] literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 586-87 (3d Cir. 2002) (quoting *Clorox Co. v. Procter & Gamble Commercial Co.*, 228 F.3d 34, 35 (1st Cir. 2000)) (internal quotations omitted). Conversely, "[w]hen the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction." *Castrol*, 987 F.2d. at 943.

### (2) The DTPA

The DTPA prohibits conduct that "[d]isparages the goods, services, or business of another by false or misleading representation of fact" or that generally "creates a likelihood of confusion or of misunderstanding." 6 Del. C. §§ 2532 (a)(8) & (a)(12). The DTPA has a lower burden of proof than the Lanham Act since "a complainant need not prove competition between the parties or actual confusion or misunderstanding" to prevail in an action under the DTPA, 6 Del. C. § 2532(b). However, plaintiff makes no specific DTPA or Delaware common law arguments in its brief, choosing instead to focus on the Lanham Act.

### a. Discussion

## (1) For use by owners of Keurig coffee makers

Plaintiff routinely tests over 2,000 cartridges when evaluating a new line of K-Cups, and any failures result in a disqualification of the product line. (D.I. 14, Sullivan Decl. at ¶¶ 3, 12) In preparation for trial, plaintiff internally tested 30 of defendant's cartridges, over 25% of which supposedly failed under normal use. (*Id.*; D.I. 14, Sullivan Decl. at ¶ 5) Therefore, plaintiff reasons that defendant's statement that its products are "for use by owners of Keurig coffee makers" is literally false, because "[t]he necessary implication of this statement is that the cartridges are functionally suitable for use with Keurig coffee makers" despite the fact that they fail to satisfy plaintiff's quality standards. (D.I. 11 at 16-17)

While the court agrees that defendant's statement necessarily implies that its cartridges are functionally suitable for use with Keurig coffee makers, it does not necessarily imply that they are up to the same quality standards as the Keurig branded cartridges. Nowhere on the box does defendant claim that its products have the same failure rate or quality level as plaintiff's. Defendant's products are marketed at a less expensive price than plaintiff's products which could imply an inferior quality.[8] (D.I. 11

---

[8] The court is unpersuaded by plaintiff's reliance on *In the Matter of Emergency Beacon Corp.*, 13 B.R. 773 (S.D.N.Y. 1981), for the proposition that "if a manufacturer sells replacement parts 'to fit' a plaintiff's product that are cheaper and have lower standards, the plaintiff has a right to protect its reputation and business against such false representation which implies that the replacement parts meet the standards required under the plaintiff's tests and specifications." *Id* at 778. *Emergency Beacon* is a case that is three decades old, from a district level bankruptcy court in another jurisdiction. In addition, the product in suit failed to obtain mandatory FAA certification, and completely failed to operate in a critical use scenario. *Id.* at 776. This is substantially different from the case at bar, where defendant's products might fail in their intended use up to 25% of the time, or as little as 0% of the time, depending on which test reports the court finds most persuasive.

at 11) (plaintiff's products cost about $0.56 per cartridge, and defendant's $0.44, a 21%
difference)

Even if the court were to require that defendant's products meet plaintiff's quality
standards, conflicting evidence on the record prevents plaintiff from showing a
likelihood of success on the merits. As discussed *supra*, plaintiff conducted an **in
house** test of 30 of defendant's cartridges, and found that they had a failure rate of
over 25%. Defendant, on the other hand, hired an **independent** testing firm who tested
over 100 cartridges without failure. (D.I. 26, Willard Decl. at ¶ 15)

### (2) Fresh brewed

While plaintiff did not address its "fresh brewed" claim in its argument section, it
was discussed in its statement of facts, it was argued during oral argument, and the
court will address it here. To this end, plaintiff simply asserts that "[n]owhere on
[defendant's] cartridge packaging does it state that the contents are instant coffee.
Instead, [defendant] misleadingly **suggests** it is fresh brewed." Since this is not a
necessary implication and is merely **suggestive**, "its tendency to violate the Lanham
Act by misleading, confusing or deceiving should be tested by public reaction," and is
not amenable to a motion for preliminary injunction. *Castrol*, 987 F.2d. at 943.

### (3) Conclusion

Because plaintiff has failed to show a likelihood of success on the merits of
proving the literal falsity of defendant's statements, plaintiff's motion for a preliminary
injunction is denied.