# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEURIG, INCORPORATED, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-841-SLR |
| | ) |
| STURM FOODS, INC., | ) |
| | ) |
| Defendant. | ) |

John W. Shaw, Esquire, Karen E. Keller, Esquire, Jeffrey T. Castellano, Esquire and David M. Fry, Esquire of Shaw Keller LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Michael A. Albert, Esquire, Gerald B. Hrycyszyn, Esquire, Christopher W. Henry, Esquire and Chelsea A. Loughran, Esquire of Wolf, Greenfield & Sacks, P.C.

Richard L. Horwitz, Esquire, David E. Moore, Esquire and Bindu A. Palapura, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Craig S. Fochler, Esquire, Scott R. Kaspar, Esquire, Aaron J. Weinzierl, Esquire and Allen A. Arntsen, Esquire of Foley & Lardner LLP.

## MEMORANDUM OPINION

Dated: September 13, 2012
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Keurig, Inc. ("plaintiff") filed this action against Sturm Foods, Inc. ("defendant") on October 1, 2010. (D.I. 1) Plaintiff manufactures a popular line of single-serve beverage brewing machines under the "Keurig" brand name, along with the corresponding beverage cartridges for use in said machines. Defendant manufactures and sells beverage cartridges for use in plaintiff's machines under the "Grove Square" brand name. In its second amended complaint, plaintiff alleges that defendant's products infringe United States Patent Nos. 7,165,488 ("the '488 patent") and 6,606,938 (the '938 patent) (counts I & II). Plaintiff's second amended complaint also asserts a variety of non-patent claims against defendant. These include: 1) trademark infringement under 15 U.S.C. § 1114 (count III); 2) false designation of origin under 15 U.S.C. § 1125(a) (count IV); 3) trade dress infringement under 15 U.S.C. § 1125(a) (count V); 4) false advertising under 15 U.S.C. § 1125(a) (count VI); 5) dilution under 15 U.S.C. § 1125(c) (count VII); 6) unfair competition under the Delaware uniform deceptive trade practices act, 6 Del. C. 1953 § 2531, *et seq.* ("DUDTPA") (count VIII); 7) unfair competition under Delaware common law (count IX); 8) false advertising under 15 U.S.C. § 1125(a) (count X); and unfair competition under 15 U.S.C. § 1125(a) (count XI). (D.I. 41) In its answer, defendant has asserted a variety of counterclaims, including: unfair competition (count I federal; count II common law); violation of the DUDTPA (count III); and cancellation of federal trademark registrations based on genericness (count IV). (D.I. 60) Defendant also asserts a variety of affirmative defenses, including unclean hands. (*Id.*)

Having denied plaintiff's motion for a preliminary injunction and defendant's motion to dismiss (D.I. 59), the court is now confronted with eleven competing summary judgment-related motions. These include:

1) plaintiff's motion for partial summary judgment that use of Sturm Foods Inc.'s cartridges in Keurig brewers meets each and every limitation of the asserted claims (D.I. 180);

2) defendant's motion for summary judgment on patent issues (D.I. 183);

3) defendant's motion for partial summary judgment on its counterclaims for unfair competition and affirmative defense of unclean hands (D.I. 186);

4) defendant's cross motion for summary judgment of noninfringement (D.I. 199);

5) plaintiff's cross motion for summary judgment on patent issues (D.I. 202);

6) defendant's motion for summary judgment on counts III, IV, V, VIII and X (trademark infringement, false designation, trade dress infringement, DUDTPA and false advertising respectively) (D.I. 206);

7) plaintiff's cross motion for summary judgment on non-patent issues (D.I. 209);

8) defendant's motion to strike improper evidence and argument from Keurig's opposition to defendant's motion for summary judgment on counts III, IV, V, VIII and X (D.I. 245);

9) plaintiff's motion to dismiss for lack of standing and subject matter jurisdiction (D.I. 253);

10) defendant's motion to strike Robert L. Klein's expert report on genericism and to exclude his corresponding expert testimony (D.I. 274); and

2

11) defendant's motion to strike Robert L. Klein's expert report on trademark confusion survey methodology and results and to exclude his corresponding expert testimony (D.I. 277).

The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367.

## II. BACKGROUND

Plaintiff has patented and sells, along with its licensees, a commercially popular line of single-serve beverage brewers. (D.I. 188 at Ex. 6, pg. 17) Plaintiff and its licensees also manufacture beverage cartridges, known as "K-Cups," for use in these brewers. (*Id.* at pg. 37) K-Cups are sold under various brand names including, for instance, Gloria Jeans, Café Escapes, Green Mountain and Van Houtte. (*Id.* at Ex. 1, pgs. 18-19) K-Cups come in an assortment of varieties; for instance, some K-Cups produce coffee and others produce hot chocolate or tea. While many K-Cups contain ground coffee and/or a filter, not all do. (D.I. 210 at 30) The term "Keurig" and the terms "K-Cup" and "K-Cups" are trademarked by plaintiff.

In 2010, defendant introduced a Grove Square line of beverage cartridges for use in Keurig brewers. (D.I. 187 at 3-4 (citing D.I. 188 at Ex. 5)) The Grove Square packaging includes the phrase: "*For use by owners of Keurig coffee makers." (D.I. 207 at 7)

As discussed, at issue are two of plaintiff's patents on its brewer technology. The '488 patent, titled "Brew Chamber for a Single Serve Beverage Brewer," was issued January 23, 2007. The one claim asserted, dependent claim 29, is reproduced below along with independent claim 22 upon which it relies:

22. A method for forming a beverage, comprising:

3

providing a beverage forming device having a housing with a receptacle accessible to a user, the receptacle having an opening to receive a beverage cartridge, and the receptacle opening having a center axis extending from a center of the opening;

moving the receptacle from a vertical position, in which the center axis extends vertically and intersects a lid in a closed position, to a forwardly inclined position in which the opening of the receptacle to receive a cartridge faces away from the lid, and the center axis does not intersect the lid in an open position;

moving the lid to the open position;

providing a beverage cartridge in the receptacle while the receptacle is in the forwardly inclined position;

moving the receptacle to the vertical position;

moving the lid to the closed position in which the lid cooperates with the receptacle to at least partially enclose the beverage cartridge; and

providing a liquid into the beverage cartridge to produce a beverage.

29. The method of claim 22, further comprising piercing the beverage cartridge with an inlet probe when the lid is moved to the closed position.

The '938 patent, titled "Two Step Puncturing and Venting of Single Serve Filter

Cartridge in Beverage Brewer," was issued August 19, 2003. Claims 6, 7 and 8,

asserted in this case, are reproduced below:

6. A method of brewing a beverage from a beverage medium contained in a disposable cartridge, comprising the following steps, in sequence:

(a) piercing the cartridge with a tubular outlet probe to vent the cartridge interior;

(b) piercing the cartridge with a tubular inlet probe;

(c) admitting heated liquid into the cartridge interior via the inlet probe for combination with the beverage medium to produce a beverage; and

(d) extracting the beverage from the cartridge interior via the outlet probe.

7. The method of claim 6 wherein step (a) is achieved by resiliently urging the cartridge against the outlet probe.

8. The method of claim 7 wherein the cartridge is resiliently urged against the outlet probe in response to movement of the inlet probe towards the cartridge.

## III. STANDARD

4

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

5

## IV. DISCUSSION

### A. Patent Exhaustion

Plaintiff has moved for summary judgment on the issue of infringement of the

'488 and '938 patents. Although defendant raised a variety of defenses to the motion,

the court focuses on the issue of patent exhaustion, which is determinative. The court

begins its analysis by an examination of *Quanta Computer, Inc. v. LG Electronics, Inc.*,

553 U.S. 617 (2008) - a case to which both parties cite in support of their positions.

#### 1. *Quanta Computer, Inc. v. LG Electronics, Inc.*

In *Quanta*, LG Electronics Inc. ("LGE") purchased a portfolio of computer

technology patents, including one system and two method patents that related to a

computer's memory and data usage. LGE then licensed those patents to Intel

Corporation ("Intel") via a license agreement. The agreement permitted Intel to

manufacture and sell microprocessors and chipsets that used the LGE patents.

Further, with respect to third party purchasers of Intel products, the agreement

stipulated that such products would be licensed by LGE and, therefore, be non-

infringing; however, the license did not extend to any product made by combining an

Intel product with a non-Intel product. Quanta, aware of this stipulation, purchased

microprocessors and chipsets from Intel and manufactured computers using these Intel

parts in combination with non-Intel parts in ways that practiced the LGE patents. LGE

filed a complaint alleging that the combinations infringed. On these facts, the Supreme

Court was tasked with deciding "whether patent exhaustion applies to the sale of

6

components of a patented system that must be combined with additional components

in order to practice the patented methods." *Id.* at 621.

The Court began its analysis by emphasizing that "[t]he longstanding doctrine of

patent exhaustion provides that the initial authorized sale of a patented item terminates

all patent rights to that item." *Id.* at 625. It then turned its attention to LGE's argument

that exhaustion does not apply to method claims. The Court dismissed this argument,

noting that "[o]ur precedents do not differentiate transactions involving embodiments of

patented methods or processes from those involving patented apparatuses or

materials. To the contrary, this Court has repeatedly held that method patents were

exhausted by the sale of an item that embodied the method." *Id.* at 628-629. The

Court went on to explain that

> eliminating exhaustion for method patents would seriously undermine the
> exhaustion doctrine. Patentees seeking to avoid patent exhaustion could
> simply draft their patent claims to describe a method rather than an
> apparatus. Apparatus and method claims may approach each other so
> nearly that it will be difficult to distinguish the process from the function of the
> apparatus. By characterizing their claims as method instead of apparatus
> claims, or including a method claim for the machine's patented method of
> performing its task, a patent drafter could shield practically any patented item
> from exhaustion.

*Id.* at 629-630 (citations and quotations omitted). In short, the Court emphasized the

danger of allowing parties to undertake "end-run[s] around exhaustion." *Id.* at 630.

The Court then turned its attention to *Quanta's* contention that, "although sales

of an incomplete article do not necessarily exhaust the patent in that article, the sale of

the microprocessor and chipsets exhausted LGE's patents in the same way the sale of

the lens blanks exhausted the patents in [*U.S. v. Univis Lens Co.*, 316 U.S. 241

7

(1942)]." 553 U.S. at 630. As explained by the *Quanta* Court, manufacturers in *Univis*

sold lens blanks - "rough opaque pieces of glass of suitable size, design and

composition for use, when ground and polished, as multifocal lenses in eyeglasses" - to

wholesalers that would grind the blanks into the patented finished lenses. *Id.* at 627.

Based upon those facts, the Supreme Court in *Univis* held that the sale of lens blanks

exhausted patents on the finished lenses, concluding "that the traditional bar on patent

restrictions following the sale of an item applies when the item sufficiently embodies the

patent—even if it does not completely practice the patent—such that its only and

intended use is to be finished under the terms of the patent."[1]  *Id.* at 627-28.

With the *Univis* holding in mind, the Court in *Quanta* "consider[ed] the extent to

which a product must embody a patent in order to trigger exhaustion." The Court

observed that,

> [j]ust as the lens blanks in *Univis* did not fully practice the patents at issue
> because they had not been ground into finished lenses, Quanta observes,
> the Intel Products cannot practice the LGE Patents—or indeed, function at
> all—until they are combined with memory and buses in a computer system.
> If, as in *Univis,* patent rights are exhausted by the sale of the incomplete
> item, then LGE has no postsale right to require that the patents be practiced
> using only Intel parts.

---

[1] The *Quanta* Court further elaborated on the *Univis* decision by declaring:

> The [*Univis*] Court explained that the lens blanks "embodi[ed] essential
> features of the patented device and [were] without utility until . . . ground and
> polished as the finished lens of the patent." The Court noted that, "where
> one has sold an uncompleted article which, because it embodies essential
> features of his patented invention, is within the protection of his patent, and
> has destined the article to be finished by the purchaser in conformity to the
> patent, he has sold his invention so far as it is or may be embodied in that
> particular article."

*Quanta*, 553 U.S. at 627-28.

8

*Id.* at 630. Ultimately, the Court agreed with Quanta, "find[ing] that *Univis* governs this case" and the doctrine of patent exhaustion applied. *Id.* at 631, 638. According to the *Quanta* Court, "[t]he authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article. . . . Intel's microprocessors and chipsets substantially embodied the LGE Patents because they had no reasonable noninfringing use and included all the inventive aspects of the patented methods." *Id.* at 638.

## 2. Analysis

Both parties rely on *Quanta* in support of their respective positions. Plaintiff argues that, in accordance with *Quanta*, patent exhaustion only exists when a product has 1) no reasonable non-infringing uses and 2) includes all inventive aspects of the patent. (D.I. 203 at 8-11)  Defendant responds by arguing that the two-pronged test is not applicable to the case at bar because the brewers are completed products. (D.I. 223 at 5-6)

The court agrees with defendant. *Univis* and *Quanta* dealt with patent exhaustion and the sale of "incomplete" items. Unlike those cases, plaintiff sells a product that completely practices the patent. There is no dispute that the brewers, unlike the lens blanks in *Univis*, are sold in a completed form in accordance with the patents. There is no need to determine the extent to which the brewers embody the patent when the brewers are sold in a completed form. For this reason, the court agrees with defendant that the two-prong test is inapplicable; instead, the "long-

standing doctrine" that an "initial authorized sale of a patented item terminates all patent rights to that item" is applicable. *Id.* at 625.

Plaintiff argues it is improper for the court to look to the apparatus claims in making a decision on exhaustion, as opposed to undertaking a claim by claim analysis and focusing on the method claims at issue. (D.I. 203 at 11) As the *Quanta* Court explained, however, "[o]ur precedents do not differentiate transactions involving embodiments of patented methods or processes from those involving patented apparatuses or materials. To the contrary, this Court has repeatedly held that method patents were exhausted by the sale of an item that embodied the method." *Id.* at 628-629. Given that plaintiff explicitly argues that the method claims at issue are infringed through the use of the patented apparatuses (D.I. 181 at 2), the court has no trouble concluding that use of the brewers embodies the methods at issue.

Further, as discussed above, the *Quanta* Court has warned about the dangers of parties attempting an "end-run" around the exhaustion doctrine via the use of method claims. The purpose of the patent exhaustion doctrine is to ensure that a patentee surrenders its statutory monopoly after it has received compensation for an article sold that embodies its patent. Were the court to find that the method claims were not exhausted because different types of cartridges - one time use versus reusable - could be utilized in a brewer, plaintiff would profit from brewer sales without forfeiting the right to sue those individuals who purchased plaintiff's products. In other words, depending on the type of cartridge utilized by a Keurig brewer owner, plaintiff could sue a purchaser of its product. That outcome is contrary to the spirit of the doctrine and

10

inappropriate on the given facts.[2]  As explained by the court in *Static Control*

*Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575, 582 (E.D. Ky. 2009), a

review of Supreme Court precedent on the law of patent exhaustion "reveals that the

Court has consistently held that patent holders may not invoke patent law to enforce

restrictions on the postsale use of their patented products.  After the first authorized

sale to a purchaser who buys for use in the ordinary pursuits of life, a patent holder's

patent rights have been exhausted."  Here, plaintiff is attempting to institute a postsale

restriction that prevents non-Keurig cartridges from being used in Keurig brewers.

Supreme Court precedent prevents plaintiff from undertaking such an end run.

## B. Non-Patent Issues

### 1.  Plaintiff's motion to dismiss defendant's counterclaim IV for lack of standing or subject matter jurisdiction

Count IV of defendant's counterclaims seeks to cancel plaintiff's registration of

the terms "K-Cup" and "K-Cups" due to their alleged generic use.  (D.I. 60 at ¶ 25-30)

In response to this claim, plaintiff has filed a motion to dismiss count IV for lack of

standing and subject matter jurisdiction.  (D.I. 253)

Section 14 of the Lanham Act permits a "petition to cancel a registration of a

mark" made by "any person who believes that he or she will be damaged . . . by the

registration of the mark."  15 U.S.C.A. § 1064.  To establish standing, both parties

acknowledge that a party must show a "real interest" in the outcome of a preceding, i.e.,

---

[2]  Keep in mind that it is the brewer and the use of the brewer that are claimed, not the cartridge itself.

11

"a direct and personal stake in the outcome of the opposition [to the registration]," such as a direct injury, as opposed to the interest of a mere intermeddler. *Ritchie v. Simpson*, 170 F.3d 1092, 1095-96 (Fed. Cir. 1999); (D.I. 255 at 5293 at 14-15).  As the Federal Circuit explained in *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000), standing "requires only that the party seeking cancellation believe that it is likely to be damaged by the registration," and a "belief in likely damage can be shown by establishing a direct commercial interest."

Plaintiff emphasizes that the "K-Cup" and "K-Cups" marks have not been asserted in the case; it is the "KEURIG" mark that is at issue.  Defendant argues it has a real, or direct commercial, interest in the "K-Cup" and "K-Cups" marks because it is a direct competitor to Keurig.  (D.I. 293 at 15-16)  Direct competition alone, however, is insufficient.  *See Windsurfing Int'l Inc. v. AMF Inc.*, 828 F.2d 755, 758 (Fed. Cir. 1987).  And while the K-Cup mark has been put at issue in these proceedings, defendant has not attempted to use that mark or something similar; for this reason, the court finds that defendant has no direct commercial interest relative to the "K-Cup" registration.[3]  Accordingly, defendant lacks standing to sue on counterclaim IV.[4]

### 2. Cross motions for summary judgment on defendant's counterclaims

---

[3] For instance, while false advertising claims have been made by defendant with respect to the contents and make-up of K-Cups, these allegations center on plaintiff's means of advertising and do not implicate how the fact of the registration itself damages defendant.

[4] Because the court finds that defendant lacks standing, the court will not address the merits of defendant's genericness claims.

Defendant filed counterclaims for unfair competition under Section 43(a) of the Lanham Act, a common law unfair competition claim, and a DUDTPA claim. (D.I. 60 at 31-33) In its motion for summary judgment on those claims, defendant argues that plaintiff falsely represents that all of its K-Cups contain 1) a filter and 2) ground coffee. (D.I. 187 at 17)

In order to prevail on false advertising claims, the parties agree that defendant must prove the following: 1) plaintiff has made false or misleading statements as to its own product; 2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) the deception is material in that it is likely to influence purchasing decisions; 4) the advertised goods traveled in interstate commerce; and 5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. (D.I. 187 at 15; D.I. 210 at 29); *see also Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994). There are two different theories of recovery for false advertising under § 43(a): "(1) an advertisement may be false on its face; or (2) the advertisement may be literally true, but given the merchandising context, it nevertheless is likely to mislead and confuse consumers." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993). The test for literal falsity is an objective one for the court's determination. "[I]f a defendant's claim is untrue, it must be deemed literally false" regardless of the advertisement's impact on the buying public. *Id.* at 943-44. Further, "only an unambiguous message can be literally false," and "[a] literally false message may be either explicit or conveyed by necessary implication when, considering the

13

advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,* 290 F.3d 578, 586-87 (3d Cir. 2002) (quoting *Clorox Co. v. Procter & Gamble Commercial Co.*, 228 F.3d 34, 35 (1st Cir. 2000)) (internal quotations omitted). Conversely, "[w]hen the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction." *Castrol*, 987 F.2d. at 943.

Defendant argues that plaintiff has made **literally false** statements with respect to K-Cups containing filters and ground coffee. (D.I. 187 at 17) In support of its position, defendant points the court to brewer packaging. (D.I. 187 at 7-11 (citing D.I. 188 at exs. 12; 13)) The various brewer packages contain photos of a K-Cup with reference to the K-Cups "paper filter," "technically advanced filter" and "internal filter." (*Id.*) With reference to ground coffee, the various packages also state that: 1) "the K-Cup design holds fresh roasted coffee;" "K-Cups contain the ideal grind and measure of fresh 100% Arabica beans;" and "Each K-Cup contains the perfect grind and measure." (*Id.*) Defendant also points the court to a Green Mountain press release celebrating Keurig's 10th anniversary; the release states the following: "The K-Cup serves as a mini-brewer complete with a filter and fresh ground coffee[.]" (*Id.* at ex. 15)

Plaintiff does not deny that certain K-Cups do not contain a filter or coffee. (D.I. 210 at 30) Plaintiff does dispute that it has made literally false statements, explaining that its advertising

14

> is not rendered false by [its] sales of K-Cup portion packs that do not contain
> filters and/or ground coffee. . . . Keurig advertises and provides customers
> with information describing what is contained within the typical (and flagship)
> coffee K-Cup portion pack . . . Notably, however, Keurig never claims that
> each and every K-Cup portion pack sold (including, non-coffee catridges)
> contains ground coffee and a filter - indeed, there are a number of beverage
> products that contain no coffee (e.g., tea) and some that are powdered
> beverages (e.g., hot chocolate), and, therefore, need no filter in order to
> successfully create a beverage.

(D.I. 210 at 30-31)

Both parties look to the court's decision in *Schering-Plough Healthcare Products,*

*Inc. v. Neutrogena Corp.*, 2010 WL 1992247,(D. Del. May 18, 2010). In *Schering-*

*Plough*, a commercial featured a close up of a suntan lotion bottle that "prominently

display[ed] the 'with Helioplex® broad spectrum uva\*uvb protection' logo." *Id.* at \*1.

There was no dispute that the product did not contain the Helioplex® technology. *Id.* at

\*3. Defendant argued that Helioplex® technology was "sufficiently elastic" to

encompass a different, but similar, lotion formula. *Id.* The court rejected this argument,

finding that defendant had not "subsequently provided the public a contrary or

expanded representation and, therefore, the public has no basis on which to perceive

the 'flexibility' in the formula advocated by defendant." *Id.* The court went on to say,

"[d]efendant's message is unambiguous and explicit, insofar as it provided the public

with a specific formula for Helioplex®, and its labeling and advertisements for [the lotion

at issue] clearly represented that Helioplex® was present. In the absence of

Helioplex®, defendant's labeling and advertisements were literally false." *Id.* (citation

omitted).

In reliance on this case, defendant contends that plaintiff's statements "were unambiguous[ly] and explicit[ly]" false. (D.I. 187 at 16)  Plaintiff, on the other hand, asserts that: "[T]he consuming public [bears] a 'flexible' understanding that powdered beverages such as hot cocoa or chai latte do not include ground coffee and need not be filtered. Keurig's advertising about the contents of its coffee brewing system, including its coffee K-Cup portion packs and the technology utilized to brew this coffee is not rendered false by the existence of portion packs that do not, and need not, contain ground coffee or filters." (D.I. 210 at 32)

The court finds that the above-discussed statements regarding filters and ground coffee are not unambiguously false.  None of the statements assert that **every** K-Cup contains a filter and ground coffee.[5]  Moreover, when viewed in the proper context - i.e., the brewer packaging (as opposed to a package containing cartridges) - it is clear that these statements (including the "each K-Cup . . ." statement) are meant to **generally describe** how the brewing process works; they are not meant to explain how the process works with respect to specific beverage cartridges.  Keurig has not placed the above-described statements on the K-Cup packaging - such as hot chocolate packaging - and a consumer would be well aware that non-coffee-based products - such as hot chocolate - would not contain coffee or need a filter.  Accordingly, the court

---

[5] While the "**each** K-Cup contains the perfect grind and measure" statement arguably indicates as much, for the reasons discussed below, the court finds that it does not unambiguously do so.

grants summary judgment for plaintiff to the extent that the statements placed at issue are not literally false.

### 3. Cross motions for summary judgment on defendant's affirmative defense of unclean hands

Defendant argues that plaintiff should be prevented, via the doctrine of unclean hands, from asserting false advertising and unfair competition claims against it given plaintiff's own "unclean" conduct. (D.I. 187 at 17-18) Defendant bases its unclean hands defense on a finding that plaintiff engaged in false advertising and unfair competition. Because the court has found that plaintiff has not made any literally false statements, the court will not invoke the equitable doctrine of unclean hands to bar plaintiff from asserting its false advertizing and unfair competition claims against defendant.

### 4. Defendant's motion for summary judgment on counts III, IV, V, VIII and X[6]

---

[6] Relevant to this motion is defendant's motion to strike certain improper evidence and argument that plaintiff relied on in opposition to defendant's motion for summary judgment on these counts. (D.I. 245) Specifically, defendant seeks to exclude: 1) the testimony of Orlando Soto ("Soto") regarding Grove Square cartridge failure rates; and 2) plaintiff's recent customer complaint logs. (D.I. 246 at 1)

The court denies defendant's motion to strike the testimony of Orlando Soto as it relates to testing that he did of Grove Square beverage cartridges. Clearly Mr. Soto's testing was identified as potentially relevant evidence at the preliminary injunction stage of these proceedings. Despite the above, he was not formally identified as an expert witness consistent with the deadlines of the Rule 16 scheduling order. In ruling on defendant's objections to plaintiff's untimely identification of Soto as an expert, Magistrate Judge Thynge - to whom discovery disputes had been referred - determined that Mr. Soto could not be used as an expert, but could give his "lay opinion" concerning his observations with respect to the testing of the Grove Square cartridges. (D.I. 247, ex. C) Neither party appealed from that determination. The court declines to entertain

### a. Counts III, IV & VIII:  trademark infringement, false designation and unfair competition under the DUDTPA

_____

further argument at this juncture of the proceedings.

With respect to defendant's motion to strike plaintiff's "post-October 1, 2010 summary" (D.I. 245), the court finds that the "agreement" contained in plaintiff's responses to an August 10, 2011 meet and confer (D.I. 247, ex. E at 2) is ambiguous at best and not practiced consistently (see, e.g., D.I. 283). Moreover, although Magistrate Judge Thynge protected from production defendant's consumer complaint log on the basis of the agreement, to apply that logic to plaintiff's consumer complaint log makes no sense in the context of the case, where consumer confusion is at the heart of the case and no such evidence existed at the time suit was initiated in October 2010, since defendant had just launched its products.  To the extent, if any, that such evidence has not been vetted through discovery because of confusion over this one sentence agreement, the court will discuss the remedies with the parties at the pretrial conference.

Also relevant is defendant's motion to strike Robert L. Klein's expert report on trademark confusion survey methodology and results and to exclude his corresponding expert testimony (D.I. 277).  The court denies said motion.  In the first instance, the court finds Mr. Klein qualified to design, conduct or testify on the subject of his report. Having read the cases cited by defendant in which Mr. Klein's methodology was criticized, nonetheless, Mr. Klein was deemed an expert in this field in said cases.

With respect to the criticisms leveled at Mr. Klein's report at bar, the court finds them unpersuasive.  Indeed, the court concludes that the universe selected was correct, that is, any consumer who buys beverage cartridges for use in a Keurig brewer. The suggestion that the universe should have been limited to only "potential purchasers of 'Grove Square' products" would have produced a meaningless survey, in the context of the issues in dispute, especially when one considers that defendant is targeting the larger universe.  With respect to defendant's criticism that Mr. Klein used a control from the real world in a setting that approximated a real world display of beverage cartridges, said methodology surely made the survey more, not less, reliable.  *See, e.g., Bd. of Regents v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 676 (W.D. Tex. 2008) ("It is difficult to understand how it would bias the results to show the general consuming public the mark in the typical circumstances in which the public would confront that mark in the marketplace, rather than showing them it in a manner in which they would likely **not** confront it.").  Finally, the court concludes that the survey questions were appropriately structured to address the issue at bar.  Any of the above (or remaining) criticisms leveled at Mr. Klein's expert testimony go to the weight and may be judged by the jury.

The packaging for defendant's product has the following statement on it: "For use by owners of Keurig® coffee makers." Defendant argues that the use of the trademarked term "Keurig" causes no customer confusion and, therefore, summary judgment is appropriate on counts III, IV and VIII. (D.I. 207 at 14)

Both parties agree that claims for trademark infringement, false designation and a violation of the DUDTPA are maintained by proving: (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3) defendant's use of plaintiff's mark to identify goods or services is likely to create confusion concerning the origin of the goods or services.[7] *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 847 (D. Del. 2006) (citing, inter alia, *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005)); (D.I. 207 at 13; D.I. 224 at n8); *see also Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270, 279 (3d Cir. 2001); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Likelihood of confusion exists when consumers viewing a mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. *Checkpoint*, 269 F.3d at 280; *Victoria's Secret*, 237 F.3d at 211. The parties further acknowledge that a likelihood of confusion is analyzed by reference to relevant *Lapp*[8] factors. (D.I. 207 at 13; D.I. 224 at 10) These include:

---

[7] Elements 1 and 2 do not appear to be disputed in this motion; only element 3, the likelihood of confusion, is put at issue on defendant's motion.

[8] *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).

19

(1) degree of similarity between the owner's mark and the alleged infringing mark;

(2) strength of the owner's mark;

(3) price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) length of time the defendant has used the mark without evidence of actual confusion;

(5) intent of the defendant in adopting the mark;

(6) evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d at 463. Not all factors (especially factors 1 and

2) are relevant in a nominative fair use context such as this. *Century 21 Real Estate*

*Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 224 (3d Cir. 2005). No single *Lapp* factor is

determinative in a likelihood of confusion analysis, and each factor must be weighed

and balanced against the others. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700,

709 (3d Cir. 2004); *Checkpoint*, 269 F.3d at 280.

Despite the above analysis being a clear issue of fact for the jury to decide,

defendant has asked the court to find for it on summary judgment. *See e.g., David's*

*Bridal, Inc. v. House of Brides, Inc.*, 2010 WL 323306, at *6 (D.N.J. Jan. 20, 2010) ("In

*[Facenda v. N.F.L. Films, Inc.,* 542 F.3d 1007, 1024 (3d Cir. 2008)*],* the Third Circuit

held that the overall weighing of the *Lapp* factors is a question of fact, and that factual

disputes over particular factors should be resolved at trial."); *Brown & Brown, Inc. v.*

*Cola,* 745 F. Supp. 2d 588, 617 (E.D. Pa.,2010) ("Ultimately, likelihood of confusion is,

at its core, a question of fact."). Because plaintiff has raised genuine issues of material

fact in response,[9] the court declines to grant summary judgment on this record.

### b. Count V: trade dress infringement

Section 43(a) of the Lanham Act, which establishes a cause of action for trade

dress infringement,[10] provides that:

> [A] person who shall . . . use in connection with any goods or services . . .
> any false description or representation, including words or other symbols
> tending falsely to describe or represent the same . . . shall be liable in a civil
> action by any person . . . who believes that he is or is likely to be damaged
> by the use of such false description or representation.

---

[9] For instance, with respect to factor four, actual confusion (a highly relevant
factor), plaintiff has produced survey, consumer testimonial and consumer complaint
evidence which suggests that defendant's use of the word "Keurig®" on its packaging is
misleading.

[10] "Trade dress refers to the design or packaging of a product which serves to
identify the product's source.  It is the total image or overall appearance of a product,
and includes, but is not limited to, such features as size, shape, color or color
combinations, texture, graphics, or even a particular sales technique.  The purpose of
trade dress protection is to secure the owner of the trade dress the goodwill of his
business and to protect the ability of consumers to distinguish among competing
producers." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 357
(3d Cir. 2007) (citations and quotations omitted).

15 U.S.C. § 1125(a). "To establish trade dress infringement under the Lanham Act, a plaintiff must prove that: (1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil Nutritionals, LLC v. Heartland Sweeteners*, LLC, 511 F.3d at 357. "This three-part inquiry alone, however, is insufficient when the plaintiff in a trade dress action seeks protection under the Lanham Act for a series or line of products or packaging. '[W]hen protection is sought for an entire line of products, [the Third Circuit's] concern for protecting competition is acute.'" *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 172 (3d. Cir. 2000) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2nd Cir. 1997)). This concern led to the development of the "consistent overall look" standard:

> Because of the broad reach that protection of trade dress for a series or line of products would embrace, [the Third Circuit] will require this more stringent test before the non-functionality/distinctiveness/likelihood of confusion test is applied. A plaintiff, seeking protection for a series or line of products, must first demonstrate that the series or line has a recognizable and consistent overall look. Only after the plaintiff has established the existence of recognizable trade dress for the line or series of products should the trial court determine whether the trade dress is distinctive, whether the trade dress is nonfunctional, and whether the defendant's use of plaintiff's trade dress is likely to cause consumer confusion.

*Rose Art Indus., Inc.*, 235 F.3d at 173.

Defendant first argues that plaintiff has no consistent overall look across its K-Cup product lines. (D.I. 207 at 9) Plaintiff readily acknowledges as much, but correctly

22

notes that "the law permits Keurig's covered 'product line' to be narrower than the

entirety of its [K-Cup] product offerings." (D.I. 224 at 27) (citing *Rose Art*, 235 F.3d at

173 ("[T]he plaintiff in a trade dress action under section 43(a) of the Lanham Act is free

to seek trade dress protection for whatever products or packaging it sees fit. A plaintiff

can seek trade dress protection either for a single product or for a whole line of

products. Moreover, in seeking protection for the trade dress of a line of products, the

plaintiff can define the line as it sees fit.")).

> Plaintiff, in is complaint, has defined its trade dress as such:
>
> [1] an image of single-serve beverage cartridges, with at least one beverage cartridge depicted on its side and one beverage cartridge depicted right-side up, and a tagline below the image of the cartridges that states they are for use in Keurig brewers, [2] an image of spilled coffee beans, [3] an indication of the coffee's roast strength on a graded bar with shading varying from light to dark, along with an indication whether the coffee is caffeinated, [4] perforations for opening the package that form an opening that is tapered in a vshape and ending in a u-shaped tab, [5] prominent lettering displaying the name of the beverage, and [6] another face of the packaging providing a product story.

(D.I. 41 at ¶ 57) Plaintiff concedes that the entire line of K-Cup offerings fails to

conform to this look. Nevertheless, plaintiff points to its Green Mountain line of K-Cups

and argues that it does contain the above discussed characteristics. Having reviewed

the packaging identified by plaintiff, the court agrees that the Green Mountain

packaging contains all of the features addressed above. (D.I. 224 at 27-28) Therefore,

23

the court finds that, at the least, a genuine issue of material fact exists with respect to the existence of a consistent overall look.[11]

Alternatively, defendant asserts that, even if a consistent overall look exists, there is no issue of fact regarding the existence of a likelihood of confusion. (D.I. 207 at 11) "A likelihood of confusion exists when consumers viewing the defendant's trade dress probably would assume that the product it represents is associated with the source of a different product identified by the plaintiff's similar trade dress. The likelihood of confusion between two trade dresses is a question of fact." *McNeil*, 511 F.3d at 357. In deciding this question of fact, the *Lapp* factors are again employed.[12]

---

[11] To the extent that the discussed line is no longer utilized by plaintiff or plaintiff is asserting a new trade dress, the court will address that argument further at the parties' pretrial conference. (See D.I. 249 at 1-2)

[12] In the trade dress context, these include the following (although not every factor is necessarily relevant to every case):

(1) the degree of similarity between the plaintiff's trade dress and the allegedly infringing trade dress;

(2) the strength of the plaintiff's trade dress;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used its trade dress without evidence of actual confusion arising;

(5) the intent of the defendant in adopting its trade dress;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

24

 The "single most important factor" in determining likelihood of confusion is trade dress similarity and the proper test is not side-by-side comparison but whether the trade dresses create the same overall impression when viewed separately of each other. *Id.* at 359.

Again, summary judgment is not appropriate on this fact-intensive inquiry. To the extent that defendant asks the court to decide whether the "overall impression" of the two packages is the same, the court will not undertake an inquiry properly reserved for the trier of fact. Further, plaintiff has raised issues of fact on other relevant factors; for instance, plaintiff has introduced evidence suggesting that defendant's marketing team originally set out to model their packaging off the Green Mountain packaging display. (D.I. 225 at ex. U)

### c. Count X: false advertising

Count X of plaintiff's complaint alleges a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). According to plaintiff, defendant's use of the phrase "For use by owners of Keurig® coffee makers" is false and/or misleading because the Strum cartridges often fail to work properly with Keurig brewers and, therefore, defendant has misinformed the public with respect to the effectiveness of Strum cartridges in Keurig

---

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the plaintiff to manufacture a product in the defendant's market, or that the plaintiff is likely to expand into that market.

*McNeil*, 511 F.3d at 358.

brewers. (D.I. 41 at ¶¶ 103-121) As discussed above, in order to prevail on this claim, plaintiff must prove, among other things, that defendant made a literally false and/or misleading statement. *See*, *supra* pg. 13-14.

While defendant argues for summary judgment on this claim, plaintiff has set forth genuine issues of material fact that prevent such a finding. The court again declines to find the "For use by owners of Keurig® coffee makers" to be literally false by implication (i.e., unambiguously false) for the reasons already addressed in its previous opinion.[13] With respect to whether the statement misleads the public into believing that the cartridges will work more consistently than they actually do, plaintiff has presented evidence which suggests that the Strum cartridges fail at a significantly higher rate than those manufactured by plaintiff and that said failure rate would be unanticipated and unacceptable to consumers. (D.I. 224 at 25-26) To the extent that defendant objects to the admissibility of this evidence, the court has already ruled that such evidence may be proffered at trial.

## V. CONCLUSION

For the foregoing reasons, the court:

1. Grants defendant's patent-related motions (D.I. 183 and D.I. 199) to the extent that they assert the defense of patent exhaustion; plaintiff's patent-related

---

[13] "While the court agrees that defendant's statement necessarily implies that its cartridges are functionally suitable for use with Keurig coffee makers, it does not necessarily imply that they are up to the same quality standards as the Keurig branded cartridges." (D.I. 58 at 19)

motions (D.I. 180 and D.I. 202) are denied to the extent they conflict with the court's ruling in this regard.

2. Grants plaintiff's motion to dismiss for lack of standing (D.I. 253); defendant's motion to strike Robert Klein's expert report on genericism (D.I. 274) is thereby mooted.

3. Denies defendant's motion for partial summary judgment on its counterclaims for unfair competition and affirmative defense of unclean hands (D.I. 186).

4. Grants plaintiff's cross motion for summary judgment on non-patent issues (D.I. 209) to the extent that its advertising is deemed to be not literally false.

5. Denies defendant's motion for summary judgment on counts III, IV, V, VIII and X (trademark infringement, false designation, trade dress infringement, DUDTPA and false advertising respectively) (D.I. 206).

6. Denies defendant's motion to strike improper evidence and argument from plaintiff's opposition to defendant's motion for summary judgment on counts III, IV, V, VIII and X (D.I. 245).

7. Denies defendant's motion to strike Robert L. Klein's expert report on trademark confusion survey methodology and results and to exclude his corresponding expert testimony (D.I. 277).

An appropriate order shall issue.